BURROUGHS vs UNITED STATES.

Opinion delivered October 27, 1906.

(90 S. W. Rep. 8).

1. *Jury—Drawn Jury—Talismen, Presentation Of.*

A jury empaneled under Section 2221 and Section 2222 Mansf. Dig. (Ind. Ter. Ann. St. 1899, Articles 1564 and 1565) is called a "drawn jury" and at no time, whether the panel is exhausted or not, is there more than the number necessary to complete the jury presented to the parties for challenge. It is true, that if the panel is exhausted, the court must order summoned from the bystanders twice the number necessary to complete the jury, the names of all are to be put into the box, but only the number necessary to complete the panel are to be sworn.

2. *Same—Waiver of Drawn Jury.*

> Sec. 2223 Mansf. Dig. (Ind. Ter. St. 1899, Art. 1566) provides for the parties waiving the drawing of the jury as provided by Sections 2221 and 2222 (Ind. Ter. Ann. St. 1564 and 1565) and the failure of defendant to object to the manner of presenting jurors to him for challenge, and his failure to save exceptions, constituted a waiver of his right to such a jury.

3. *Same—Relative to Swearing Whole Panel.*

> Under Mansf. Dig. Art. 2223 (Ind. Ter. Ann. St. 1899, Art. 1566) providing that by consent of parties the drawing of the jury may be waived; the court may call into the box the number required to complete the jury and is not required to swear the entire panel.

4. *Same—Evidence Dying Declarations, What Are,*

> The statement of the deceased, when offered in evidence as dying declarations, must relate to the transaction which occurred at the time the mortal wound was inflicted by the defendant, and which is a part of the res gestae of that transaction. And whether the dying declaration referred to the very time of the shooting, the answer of the witness must not only be considered, but the form of the question propounded.

5. *Same—Self Defense—Admissibility of Evidence of Threats.*

> Defendant, a brakeman, was charged with the murder of a twelve year old boy, and claimed that as the train was passing through a certain town he was struck with a rock and that another rock struck the caboose. That he shot into the darkness without seeing anyone for the purpose of scaring the stone throwers. *Held,* the government having introduced in evidence as dying declarations, statements of the deceased, that he had thrown no stones on the night he was shot. It was error for the court to exclude evidence of threats previously made by the deceased to stone the brakemen for their refusal to allow him to ride on their train.

Appeal from the United States Court for the Northern District of the Indian Territory; before Justice Joseph A. Gill, February 25, 1904.

W. C. Burroughs was convicted of murder, and he appeals. Reversed.

The defendant was charged in the indictment with the crime of murder. No objection is made to the indictment. The killing occurred on the 24th day of October, 1903, at Sageeyah, Cherokee Nation, I. T., a station located on the Iron Mountain Railway. The name of the deceased was Leonard D. Simmons. He was "a little past 12 years old" when he was killed. The defendant was 31 years of age, and was employed as a brakeman on a freight train of the Iron Mountain Railway. On the evening of the killing, at about 7:15, p. m., just dark, as a freight train was passing Sageeyah at a speed of about 20 or 25 miles an hour, the defendant fired a pistol shot from a window of the caboose which entered the head of the deceased a little to the left and higher than the right ear. He lived about 10 days, and then died from the effects of the wound. The defendant claimed at the trial that as the train passed Sageeyah he was sitting in the caboose with his head out of the window, looking ahead; that there was a lantern hanging on the outside of the caboose, just below the window, and he was watching the train, as it was his duty to do; that while in this position two stones were thrown at him, one striking him on the shoulder, making a considerable bruise, the other striking the caboose a little below the lantern; he at once took from under the cushion of his seat, where he had placed it, a pistol, and, because of the darkness not having seen any one.

fired one shot at random for the purpose, as he claims, of scaring away whomever it was who threw the stones, and without any intention of killing any one. There was another boy with the deceased at the time he was shot, and both he and the deceased, in his dying declaration, testified that no stones were thrown. The defendant was arrested, indicted, and tried for the killing, resulting in a verdict of "murder without capital punishment." The case is regularly appealed.

*Chew & Fitzhugh,* for appellant.

*P. L. Soper,* U. S. Atty.

CLAYTON, J. (after stating the facts). There are 32 specifications of error in the assignment, the first three and the twenty-seventh, twenty-eighth, twenty-ninth, and thirtieth of which go to the method of impaneling the jury that tried defendant. There had been 24 jurors summoned, who were in attendance on the court, as the regular panel. When the trial jury was being drawn, there having been no request for a struck jury, the court directed that from the regular panel 12 men be called and sworn on their voir dire. This was done, and 8 men of the 12 were challenged. The court then directed that 8 more jurors of the regular panel should be called and sworn. The defendant, by his counsel, then demanded that he be presented with 16 men, double the number required to complete the jury. The request was disallowed by the court, and the defendant was compelled to proceed with his challenges. Exceptions were duly saved. How many of these 8 were challenged does not appear from the record, but it does appear that some challenges were made, from the fact that the record shows that after the challenges as to these 8 had been made the court ordered three other men of the regular panel to be called and sworn, thus exhausting the whole of the regular panel,

and from them the jury was completed. The question raised by these seven specifications of error is that in the formation of a jury in a criminal case, when challenges shall have been made to some of the twelve first called, leaving the jury incomplete to the extent of the number of persons challenged, must the court call and present to the parties for further challenge a number of jurors equal to the number challenged, or twice that number? The question is answered by the following sections of Mansfield's Digest, which is the law governing the impaneling of juries in this jurisdiction in criminal cases.

"Sec. 2221. In a prosecution for felony, the clerk, under the direction of the court, shall draw from the jury box the names of twelve petit jurors, who shall be sworn to make true and perfect answers to such questions as may be asked them touching their qualifications as jurors in the case on trial, and each juror may be examined by the state and cross-examined by the defendant touching his qualifications. If the court decide he is competent, the state may challenge him peremptorily or accept him; then the defendant may peremptorily challenge or accept him. If not so challenged by either party, he shall stand as a juror in the case, and each of the twelve jurors shall be examined and disposed of in like manner. If any of said jurors are disqualified or challenged, the clerk shall draw from the box as many more as may be required, and as often as may be required, until the jury shall be obtained, or the whole panel exhausted." I. T. Ann. St. 1899, § 1564.

"Sec. 2222. When the panel is exhausted, the court shall order the sheriff to summon bystanders to at least twice the number necessary to complete the jury, whose names shall be placed in the box and drawn, and such jurors shall be sworn, examined and disposed of in the same manner as is provided for drawing, examining and disposing of the regular panel·

If the jury is still incomplete, the bystanders shall again be summoned to twice the number necessary to complete the jury, who shall, in like manner, be drawn, sworn and disposed of, and the mode herein provided shall be continued until the jury is completed." I. T. Ann. St. 1899, § 1565.

A jury impaneled by the process provided by these two sections is called a "drawn jury," and it is plain that at no time, whether the panel has been exhausted or not, is there more than the number necessary to complete the jury presented to the parties for challenge. It is true that, if the panel shall be exhausted, the court must order summoned from the bystanders twice the number necessary to complete the jury, and the names of all are to be put into the box, but only the number necessary to complete the panel are to be drawn. In this case the jurors names were not drawn from the box, but the court proceeded to impanel the jury under section 2223, Mansfield's Digest (I. T. Ann. St. 1899, § 1566), which reads as follows: "By consent of the parties, the drawing of the jury may be waived, in which case the whole panel may be sworn, examined and disposed of as provided in the preceding section. First, the clerk was directed to call the names of twelve men of the regular panel. They were sworn and eight challenged, leaving but four selected. The court then directed that the names of eight more men of the regular panel be called. This was done, and they were sworn and challenged as before, and this process was continued until the jury was completed; and, unless a drawn jury was not waived by the parties, the jury was impaneled in strict compliance with section 2223. While the record does not show affirmatively that a drawn jury was waived by the parties, it does show that there was no request made that the jury should be impaneled in that way, nor was there any exception saved to it; and, as the statute provides that a drawn jury may be waived, the silence of the parties when the jurors were presented

to them in this manner, and their failure to save exceptions, was an acquiescence in the action of the court, and as clear a waiver of the right to a drawn jury as if in open court they had so announced. The court did not err in this particular.

But counsel for appellant, in his brief, makes another objection to the action of the court in impaneling the jury, which was not made at the trial either by request or exception. He says: "It was not a compliance with the law to call into the box the number of men required to fill the jury. The very language of the statute is 'that by consent of the parties the drawing of the jury may be waived, in which case the whole panel may be sworn.' Conceding that the drawing of the jury was waived, then we insist that we were entitled to have the full panel sworn before we should have been compelled to exercise the right of peremptory challenges. If the statute were as counsel has set it out, his objection would be well taken. But the statute is not as he puts it. After the word "sworn" he places a period and stops there. But the statute does not; it follows the word "sworn" with a comma, and immediately follows it with the words "examined and disposed of as provided in the preceding section," making the entire section read: "By consent of the parties the drawing of the jury may be waived, in which case the whole panel may be sworn, examined and disposed of as provided in the preceding section," meaning, of course, not that the whole panel is to be sworn before any challenges are to be made, but to be "sworn, examined and disposed of as provided in the preceding section," and as the preceding section (2222) does not provide that the entire panel shall be sworn in the first instance, but only as are presented for challenge after their names are drawn from the box, neither does section 2223 provide that the whole panel shall first be sworn, but only as they are presented for challenge. The court did not err in this particular.

The fourth, fifth, and sixth specifications of error will be considered later.

The seventh specification of error raises the question of the competency of the dying declaration of the deceased, as testified to by Mrs. Ella L. Simmons, the mother. It is not questioned but that the grounds for the admission of the dying declarations of deceased were sufficiently laid, but it is claimed that the statements of the deceased were not admissible as dying declarations, because they related to past events, and were not a part of the res gestae. After some considerable colloquy between the court and counsel as to what part of the statements of deceased were admissible, the court, speaking to the witness, said: "If he made a statement to you, telling you what occurred and what he was doing at the time it occurred, that part is permissible to go to the jury. As to what he did before that, or what he did after the occurrence, is not permitted to go to the jury. And, if you can state what he said in reference to his particular action at the time the shot was fired, you may do so. This objection is raised by defendant and overruled by the court, and an exception allowed. You will now state, if you can. Witness: A. About what he said about throwing the stones? By the Court: No. A. I don't know what you mean. By Mr. Huckleberry: Q. State what he said he had done, not before, but at the time of, the transaction—at the time, on that night? A. I asked him if he threw anything at the train, and he said he didn't. I asked him if he did anything to cause anybody to do that, and he said he didn't." Upon the point of the dying declarations, no other question was asked the witness, either on the direct or cross examination. There is no question but that the statements of the deceased, when offered in evidence as dying declarations, must relate to the transaction which occurred at the time of the infliction of the mortal wound by the de-

fendant, and which is a part of the res gestae of that trans-
action.   In order to determine whether or not the dying de-
claration referred to the very time of the shooting, we must
not only consider the answer of the witness, but the form of the
question prepounded her, and the admonition of the court
that she confine her answer strictly to the statements of the
deceased relative to the occurrences at the time of the shooting.
The court, in language plain and easy to be understood, held
her rigidly to the rule.   The counsel for the government asked
her in simple and plain words what he (the deceased) said he
had done, not before, but at the time of the transaction—at
the time, on that night.   Her answer was:  "I asked him if
he threw anything at the train, and he said he didn't.   I asked
him if he did anything to cause anybody to do that, and he said
he didn't."   She must have been an exceedingly dull woman,
if she misunderstood the question and was testifying as to what
the deceased told her about other occurrences happening at
another time.   In her testimony on other branches of the case,
which was long and tedious, she evinced no such ignorance.
If counsel for the defendant was not satisfied that her state-
ment was within the rule so clearly stated by the court, he had
the opportunity by cross-examination to make the matter
plain, and, if he is now correct, to have had the testimony entirely
eliminated.   On this point he declined to cross-examine her,
and rested on his objection.   There is no merit in it.

The eighth, ninth, tenth, and eleventh specifications of
errors are that the court erred in excluding, over the objection
of the defendant the testimony of defendant's witnesses J. W.
Hilderbrand and James Neal.   The defendant offered to prove
by Hilderbrand that he was at Sageeyah, the place of the
killing, on the Monday before the killing, which was the fol-
lowing Saturday, and saw a boy on a railroad bicycle at the
water tank located at that place, and learned from him that he

had been pumping water there and was going to Bull Creek to pump water there; that in a conversation with him he stated that he could sometime get to ride on a freight train, but there were some brakies who would not let him ride, and that he intended to "rock hell out of them as they passed through." This was objected to by the government as being "incompetent, irrelevant, and immaterial, and not a sufficient showing that the boy was the deceased." The defendant offered to prove by James Neal that in August before the killing he was at Sageeyah, and, while there, the deceased approached him and tried to get him to go with him and gather up rocks and rock the freight trains on the Iron Mountain Railroad as they passed through Sageeyah, and that Roy East, a government witness, was present. Neal declined to go with them, telling them that they would get into trouble. The counsel for the government made the following objection to this testimony, "for the reason that same is incompetent, irrelevant, immaterial, and leading, and that it would not prove any defense to this charge. There is no testimony in this case showing self defense or any other defense so far, and this is merely a collateral matter, and could not be in aid or to corroborate any story to show some defense that has not been made in this case. While there may be some question that the identification of the boy with whom Hilderbrand was talking as being the deceased was not sufficient to render his testimony admissible, yet, as to Neal's offered testimony, there is no question but that it was the deceased with whom he was talking. And, if these declarations made by him are to be taken as threats against the defendant, we see no reason why they should have been excluded. While they were not threats made directly against the defendant, they were made against a class of which he was one, and therefore included him. They were to "rock hell out of the brakies (meaning brakemen) as they passed through," because some of them would not let him ride on the freight trains, and "to

gather up rocks and rock the freight trains on the Iron Mountain Railroad as they passed Sageeyah." The defendant was a brakeman on that railroad.

Before this proof was offered the government had introduced in evidence a confession of the defendant, to the effect in part that as he was riding on the caboose after dark, with his head out of the window while passing Sageeyah, two rocks were thrown at him, one striking him on the shoulders with great force, and one striking the caboose just below the window at which he was sitting; that he immediately procured a pistol from beneath the cushion upon which he was sitting and fired, not having seen the persons who were assaulting him. The caboose was immediately examined by the government witnesses, and beneath the window where the defendant had been sitting, and from which he fired the pistol, an indenture, made by some hard missile, was found at the place on the caboose where the defendant in his confession had said the rock had struck it. The government had also, in anticipation of this defense, introduced the dying declaration of the deceased for the sole purpose of showing that he had thrown no rocks at the train, or did anything else to provoke a difficulty or justify a killing. The mother testified: "I asked him (the deceased) if he threw anything at the train, and he said he didn't; I asked him if he did anything to cause anybody to do that, and he said he didn't." And this is all of the dying declaration of the deceased. And thus it is seen that before this proof was offered or any witness had spoken for the defendant, the government itself had raised the question and put it in some doubt as to whether the defendant, at the time of the killing, was the aggressor, and also the question as to whether the deceased had offered a provocation sufficient to arouse the defendant to irresistible anger—the one going to the right of self-defense; the other, to a mitigating fact that would, if established, reduce the killing from murder to manslaughter.

As to self-defense, it cannot be said that, because the rocks were thrown by a child, the defendant's life was not in danger, and therefore he could not invoke the law of self-defense, or after that fact appeared offer any proof to establish it. That is not the question. It is, looking at the scene as he saw it, viewing it from his standpoint, taking into consideration that it was in the darkness of the night, that he could not see the parties throwing the stones, that he had no way of knowing whether they were being thrown by the feeble arm of a child, or hurled by the stalwart arm of a full-grown man, that he did not know their number or their purpose, except by their acts, and the very suddenness of the thing, did he have reasonable ground to believe, and did he believe, that his life was in imminent danger? If so, and he were not the aggressor, although it was an unfortunate child that was killed, the killing was not unlawful. Of course, we do not say that the proof established these facts, but there is proof tending to establish them. In self-defense it must always appear that the defendant was not the aggressor, and, unless it is otherwise proven, the burden is on the defendant to show it; and, when he proves that the deceased was the aggressor, he shows that he was not. Of course, this would not be true in case of mutual combat. There both are aggressors, and neither can claim self-defense. In the law of self-defense, whenever the fact as to who was the aggressor is in question, previous threats made by the deceased against the defendant, and acts of violence towards him, whether communicated or not, are, as the law now stands, always admissible in evidence. Whart. Cr. Ev. 757; Whart. Homicide, 695; Wiggins vs Utah, 93 U. S. 465, 23 L. Ed. 941; Brown vs State, 55 Ark. 593, 18 S. W. 1051; State vs Downs (Mo. Sup.) 3 S. W. 219. The court, at some considerable length, and accurately, gave the jury in charge the law of self-defense, leaving the jury to determine from the evidence before them the question of the defendant's justification, which necessarily

included the question as to whether the defendant was the
aggressor, and that fact depended entirely and absolutely on
the fact as to whether or not the deceased threw the stones on
the night he was killed; but the court excluded the threats
recently before made by the deceased that he intended to "rock
hell out of the brakies" as they passed through, and that he
tried to get the witness Neal to go with him and gather up
rocks and rock the freight trains on the Iron Mountain Rail-
road as they passed Sageeyah.

As the proof of the rocking of the train was the only
evidence in the case on which a charge to the jury on the law
of self-defense could possibly be predicated, we think the re-
jected testimony was clearly admissible. It is true that the
counsel for the defendant was claiming all through the case that
there was no self-defense in it, that it was simply a case of un-
intentional killing, or at most manslaughter, and saved his
exception to the whole of that part of the charge relating to
self-defense. Yet the court thought otherwise, and overruled
his objection, and gave the charge. If there was no self-defense
shown by the proof, the charge was erroneous. If there was,
the rejection of the proffered testimony was error.

But if it be conceded that there was no evidence tending
to justify the act of killing, there was the question of man-
slaughter to be considered. The court in the general charge
instructed as to manslaughter on the theory that the throwing
of the rocks might be considered by the jury, if they found that
the rocks were thrown at all, as a provocation sufficient to
arouse the anger of the defendant to the degree necessary to
mitigate the crime from murder to manslaughter. The language
of the charge is: "Manslaughter is the unlawful killing of a
human being without malice express or implied, and without
deliberation. The killing of a human being in the heat of

passion, by or with a dangerous weapon, except where the killing is shown by the evidence to be either justifiable or excusable, is manslaughter. To extenuate a killing and reduce it to manslaughter, two facts must concur: There must be at the time of the killing both passion and provocation. Provocation without passion will not extenuate, nor will passion merely, without provocation, reduce the unlawful killing from murder to manslaughter. The sufficiency of the provocation does not depend alone on whether it actually caused passion and heat of blood in the defendant, but also on whether it was calculated to cause such a state of mind in a reasonable person; that is, there must be adequate cause. The nature of the weapon or method of injury must be considered in determining the adequacy of the provocation. It will require great provocation to mitigate a homicide committed with a deadly weapon." As there was no other proof tending in any degree to establish manslaughter under the charge given, it must necessarily have been predicated on the theory that the throwing of the rocks, if they were thrown, might have been a sufficient provocation to anger, and that it had that effect. The jury were properly told, in substance, that anger without provocation, or provocation without anger, was not sufficient; that both must concur and each must be proven. In a trial for murder, in order to reduce the killing to manslaughter, it is as essential to the defendant to prove provocation as it is in self-defense to prove that he was not the aggressor; and, if previous threats or hostile action of the deceased against the defendant may be proven in one case, we see no reason why they may not in the other. In self-defense threats are introduced in evidence to prove a fact tending to show that the deceased was the aggressor. In manslaughter they are introduced to prove a fact tending to show that the defendant was provoked to anger by an act of the deceased. In each case the act sought to be proven is an

aggressive act on the part of the deceased at the time of the killing, the one endangering the life of the defendant, the other provoking the defendant to irresistible anger; and, if previous threats to do the one are admissible, why are they not admissible to prove the other? We are aware that there is at least one case (Lingo vs State, 29 Ga. 470), and possibly others, which limits the proof of uncommunicated threats to cases of self-defense, but we cannot agree with the reasoning that reaches that conclusion.

It is true that the defendant in his testimony did not claim that he was angered. His claim was that he was at his place of duty, and in the darkness rocks were thrown at him and struck him. He could not see the persons throwing them, and, without any intention of killing, he fired a shot at random to scare them away. At the trial he was struggling not only for his life, but his freedom, and therefore, from the very necessity of the situation, he could not admit that he fired the shot in anger, for that would have been an admission, inferentially at least, that he fired the shot intentionally, and therefore an admission of guilt of manslaughter at least. While it may be considered reprehensible for a defendant to shape his testimony to fit a false defense, yet courts and lawyers know that in their desperate struggle for life and freedom it is often done; and hence it is not an imperative rule that a defendant must be held rigidly to his testimony when against him, especially when it is consistent with his theory of defense, but only against him on some other theory which the proof may tend to establish. Courts and juries must go to the whole of the evidence to get the truth. In this case the jury disbelieved the defendant's testimony; otherwise they could not have convicted him of murder. And in all probability that which discredited his testimony to them was that the deceased in his dying declarations and the boy, East, who was present at the shooting, in

his testimony, both stated that no rocks were thrown by either of them. With the exception of the indentation on the side of the car, the defendant's testimony stood alone as against the positive testimony of these two witnesses. Well might the jury have disbelieved him. But suppose the proffered testimony of the threats that he would "rock hell out of the brakies as they passed through," and his conduct in striving to obtain others to go with him and gather up rocks and rock the freight trains on the Iron Mountain Railroad as they passed through Sageeyah, had been admitted; could not the jury, in considering all of the evidence, taking into consideration the fact for whatever it was worth that the defendant had sworn to it, and that there was no other motive for the act shown, and the proof of the indentation upon the car, and the additional light that the rejected evidence would have thrown on the transaction, well have found the fact of the throwing of the rocks, and then, rejecting the uncorroborated and somewhat inconsistent testimony of the defendant that the shot was fired without an intent to kill, and finding that the defendant was not put in such imminent danger as would justify the shooting, and thus determining his guilt of a criminal shooting, and then in passing on the question as to whether the killing was done with that deliberate intent which would constitute the killing murder, or under such circumstances as would constitute it manslaughter, could they not, in weighing the evidence, giving to the circumstances the potency to which they were entitled, having found that the rocks were actually thrown, or, if they were in doubt of that fact, resolving it in favor of the defendant, well have found that the throwing of the rocks under the circumstances was a sufficient provocation to anger, and, if a sufficient provocation to anger, it probably produced anger, and therefore the shooting, having been done in anger, induced by a sufficient provocation, it was not done with that deliberate intent necessary to constitute it murder, but only manslaughter? The establishment

of the fact that the rocks were thrown by the deceased and the boy East, in any phase of the case was of the highest importance to the defendant. His whole case hinged upon it.

We are of the opinion that the court erred in rejecting the testimony. We think the court erred in not granting the defendant a new trial on his motion. We do not think it necessary to lengthen this opinion by specifically passing on each of the other specifications of error. We have examined them all carefully and think they are without merit.

For the error of the court above set out the case is reversed and remanded, with direction that the court below set aside its judgment in the case and grant the defendant a new trial.

TOWNSEND, J., concurs. RAYMOND, C. J., not participating.