## Wireman v. Commonweatlh.

(Decided January 27, 1925.)·

## Appeal from Magoffin Circuit Court.

1. Criminal Law—Jury Not Required to Believe Defendant's Evidence of Self-Defense.—Jury is not bound to believe evidence of accused that he acted in self-defense, especially where physical facts and attendant circumstances render his story improbable.

2. Homicide—Evidence Held 'Sufficient to go to Jury and Sustain Conviction.—Evidence held sufficient to go to jury and sustain . conviction for murder.

3. Homicide—Statements of Defendant Showing Ill Will Toward Decedent's Brother Held Improperly Admitted, Though Not Alone Reversible Error.—Evidence of statements by defendant tending to show ill will toward brother of deceased held improperly admitted, though not alone reversible error.

4. Homicide—General Threats are Admissible to Show General Malice, but Rule Does Not Include Indefinite and Remote Threats Made Several Weeks Before Homicide.—A general threat to kill some one is admissible to show general malice and purpóse to injure or kill some one, of which' deceased became victim; but such rule is confined to threats made shortly before homicide, and does not include indefinite and remote threats made several weeks before homicide.

5. Homicide—Threat by Defendant to Kill Named Person and Another Unnamed Held Inadmissible and Prejudicial.—In prosecution for killing O. C., evidence that several weeks previously defendant had threatened to kill one R. B. A. and "another man" held inadmissible and prejudicial, as threat as to "another man" was too remote and indefinite and threat to kill a particular person other than deceased is inadmissible. ·

H. H. RAMEY and W. R. PRATER for appellant.

A. F. BYRD and FRANK E. DAUGHERTY, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

George Wireman, who was charged with the murder of Ollie Carpenter, was convicted of manslaughter, and his punishment fixed at ten years' confinement in the state reformatory. He appeals.

The first ground urged for reversal is that the evidence was insufficient to take the case to the jury, or to sustain the verdict. The facts as developed by the evidence for the Commonwealth, are these: On the evening of December 17, 1923, Ollie Carpenter was killed at the

home of Adam Wireman. a brother of appellant, on
Trace fork in Magoffin county, and appellant admitted
that the deceased died from wounds inflicted by him. A
few months prior thereto Joe Wireman, another brother
of appellant, was tried for murder, and Carpenter was
one of the principal witnesses against him. Some hours
after the shooting, Carpenter's body was found in the
room on the right of the door as you enter. His feet
were in such position that the door would just miss his
feet when opened. He was on his knees, his hips were
elevated, and his face was on the floor. His right hand
was under his head and his left hand under his stomach.
Under his body was a pistol, a six-shooter, with five
loaded shells and one empty shell. The body was cold
and stiff and required some considerable effort to
straighten it out. The deceased had been shot three
times, and one of the shots entered on the left side of the
head, went through the brain, ranged downward and
came out below the ear on the right side. Another shot
struck deceased in the throat, severed an artery and
ranged downward. The third ball entered the breast
near the region of the heart, and also ranged downward.
Very little blood had come from the wounds in front,
but the wounds in the back, where the bullets had passed
out, bled profusely, and the clothing that deceased wore
was saturated with blood below the wounds. The shots
that went through the brain and through the heart were
fatal and would have caused instant death.

Virgie Wireman, a daughter of David Wireman, tes-
tified that Ollie Carpenter and George Wireman came to
her father's home a little before dark. George came first
and then Ollie. They were talking about George's
brother, Joe, and Ollie said that he swore the truth.
George said that he was not there and did not know any-
thing about that. Ollie said that he was going to get
Dud (his brother) and take him home. They then went
out the door together. Ollie asked George to wait for
him as he didn't know the way. George told him he
would wait. Ollie also asked George not to slip off
from him and said, ''I might go home with you and you
might kill me.'' George told him there was no danger.
They then left and it was dark at the time. There was
further evidence of threats which will be considered
hereafter. While there, Ollie had his pistols out and
showed them to George.

On the other hand, George Wireman testified that he lived on Trace fork of Licking river, and knew Ollie Carpenter. He left home about ten o'clock on the morning of the day that Carpenter was killed, and started to David Wireman's to get some meal. On his way he stopped at Victor Wireman's, R. B. Allen's and Amos Wireman's. It was about three-quarters of a mile across the hill to David Wireman's, but the way he traveled it was about three miles. He reached David Wireman's late in the evening. David was gone and he waited for him. He had some whiskey in a quart jar that he had brought from home, and had drunk part of it. While at David Wireman's he set the jar under the bed. Soon after his arrival Ollie Carpenter, who was drinking, came down the river and stopped at David's. Witness was in the kitchen when Ollie arrived, and Ollie came through the room where the liquor had been left and into the kitchen and told him that he had gotten a drink of his liquor, and added, "You need not be afraid to give me liquor." Witness replied that he was not. Ollie asked him not to slip off and leave him or he would kill him, and that he had two pistols. Witness told Ollie he would not leave him. When they started to leave David Wireman's Ollie said he was going across the hill, but witness tried to get him to go the river way, as he was afraid of the mule he was riding. Ollie then asked witness if he believed he swore a lie at the trial of his brother, Joe, and witness said he didn't know anything about it as he wasn't there. Ollie then said that he knew that he didn't lie. It was late when they left David Wireman's and they went across the hill past witness' home and went to the home of his brother, Adam Wireman. On their arrival there deceased asked for a cigarette and witness told him that he didn't have anything but a paper poke. Deceased said, "I don't smoke your damn paper pokes." Deceased again asked if witness believed he swore a lie about shooting the windshield out of Joe's car. Witness told him that he didn't know anything about it as he was not there. Deceased said that he had two damn good pistols and didn't care for dying, and that witness had a little family and would not want to die. There was further talk about the pistols and witness told deceased that he would love to have the 38, but would not have the other pistol. Deceased then went out of the house and called witness to help him on his horse. Deceased was standing with his bridle over the horse's

head, leaning back against the horse. He said that he swore against Joe and was against Allen's people, and asked witness if he believed that he swore a lie. Witness told him that he didn't know. Deceased said he knew God damn well he never and witness told him to let that go. Deceased then stopped talking, but added that he had heard that witness told that he had sworn a lie and told witness to take that back or take worse. Witness then started toward the house and deceased pulled his pistol and began firing at him, and following him up. Witness grabbed his pistol and pushed him back out of the door. Deceased said that he had a damn good white handled pistol, pulled it out, started back in the house, and, as he came, fired his pistol at witness. Deceased fired two shots before and one after witness got hold of the pistol. After the deceased fired, witness fired both pistols until deceased fell. After deceased fell, witness turned and went out the back door. He then went home, where he stayed for a short time, and afterwards went to Sam Howard's, where he remained for several days.

Laura Wireman, the wife of Adam Wireman, testified that George and Ollie came to her house a little after dark. She corroborated appellant as to the conversation about the cigarette paper, and the statement of the deceased that he didn't care to die, and that appellant had a little family and didn't want to die. After that conversation she says that she went out and when she came back deceased had his other pistol out. Deceased then went out and called to George to come and help him on his horse. He was leaning on his horse when George went out, and said, "Yes, I swore against Joe and I'm against Allen and all his people." She then heard George say, "Ollie, let that gun alone," and ran to the barn. She then heard two or three shots and in another minute heard some more. After that she went up to George's house in company with George and the boys. George had Ollie's pistol. There was other testimony to the effect that on the day of the homicide deceased was at the home of Allen Wireman, appellant's father, and, after speaking of his testimony at the trial of Joe Wireman, said that he knew damn well that Allen was mad at him, and also that he swore against Joe and he was against Joe and his God damn people.

Ida Wireman, the wife of Joe Wireman, while going out the front door of her home to get some water saw the deceased coming along singing and reeling in his saddle.

By the time she got into the yard he had his gun out and threw his pistol in the direction of the house. She jumped into the kitchen door and two shots were fired. Adam Wireman testified that he came home the next morning after the killing and found three bullet holes, one in the back end of the house, one in the trunk, and one through a plank in the window. These were 38 specials, and he also found that one 32 lead bullet had hit a chair. There was also evidence that deceased had been doing other shooting on that day.

In rebuttal a physician gave it as his opinion that after the deceased had been shot through the brain, or through the heart, he would not have been able to climb steps of any kind before he sank down.

The argument in behalf of appellant is that the Commonwealth not only failed to prove that the killing was unjustifiable, but that all the evidence showed that the deceased was the aggressor and that appellant acted in his necessary, or apparently necessary, self-defense. It must not be overlooked that the jury is not bound to believe the evidence of the accused that he acted in self-defense, especially where the physical facts and attendant circumstances are such as to render his story improbable. Estepp v. Commonwealth, 185 Ky. 156, 214 S. W. 891. Here the Commonwealth not only proved the motive for the crime, but proved that appellant killed the deceased. Appellant claims that he shot the deceased not only with his own pistol, but with the pistol which he had taken from the deceased, and that the deceased then fell. On the other hand, it was proved that deceased was much taller than appellant, that all of the bullets ranged downward, that the clothing of the deceased below the wounds was saturated with blood, that when deceased was found he was partly on his knees, with his head on the floor, and that his body was cold and stiff, thus justifying the inference that appellant was above deceased when the shots were fired, and that deceased did not fall immediately to the floor, as claimed by appellant. In view of these facts, and others that might be mentioned, we conclude that the evidence was such as to make appellant's guilt a question for the jury.

Lily Wireman, wife of Raney Wireman, testified that about nine or ten days before the killing appellant was at her house and she had a conversation with him.

In response to the question, "Did he make any statement there about the Carpenter boys, Dud Carpenter?" she answered, "Yes, sir, he said that Dud Carpenter had been to his house and that he gave him a 'damn good cussing' and sent him back home; that he was going to pay him what he owed him and was not going to be bothered with them any more." This evidence did not show appellant's relation with the deceased, but merely tended to show his feeling toward Dud Carpenter, a brother of the deceased, and should not have been admitted. The error, however, would not authorize a reversal if it had not been coupled with a more serious error, which we shall proceed to discuss.

Lily Wireman, a daughter of Amos Wireman, testified that she saw George Wireman on the day Ollie Carpenter was killed. George came to the store, but she never heard him say anything. She then testified as follows:

"Q. About a week before that did you see him anywhere? A. He went up Licking about a week before that.

"Q. Did he stop there about your father's house? A. Yes.

"Q. Did you hear him talking to anyone? A. No; about a month before that I heard him say he was going to kill R. B. Allen and another man."

It is the rule that a general threat to kill some one is admissible to show general malice and a purpose to injure or kill someone of which the deceased became the victim. Fugate v. Commonwealth, 202 Ky. 509, 260 S. W. 338, but the rule is confined to general threats made shortly before the homicide, and does not include indefinite and remote threats made several weeks before the homicide. Jones v. Commonwealth, 191 Ky. 485, 231 S. W. 31; Whittaker v. Commonwealth, 17 S. W. 358, 13 Ky. Law Rep. 504; Brooks v. Commonwealth, 100 Ky. 194, 37 S. W. 1043, 18 Ky. Law Rep. 702. Here, the threat was to kill R. B. Allen and another man. There is nothing in the record to show that the deceased was the other man and, as the threat was made a month or more before the homicide, we conclude that it was too indefinite and remote to be admissible. The threat to kill R. B. Allen falls within the rule that a threat to kill a particular person other than the deceased is not admissible. As the deceased was not only in an ugly frame of mind, but was

armed and looking for trouble, it is at once apparent that the case is a close one on facts, and as the threat referred to may have turned the scales against appellant by causing the jury to reject his story of self-defense, we conclude that its admission was prejudicial.

Judgment reversed and cause remanded for a new trial consistent with this opinion.