## A. J. HUNT v. STATE.

No. A-4761.   Opinion Filed Feb. 24, 1925.
(233 Pac. 506.)

(Syllabus.)

1. **Homicide—Manslaughter in First Degree—Evidence Sufficient.**
In a prosecution for murder, evidence examined, and held sufficient to sustain the verdict of manslaughter in the first degree.

2. **Homicide—Self-Defense—Apprehension of Danger—Reasonable**

**Grounds for Fear.** The bare belief of one assaulted that he is about to suffer death or great personal injury will not of itself justify him in taking the life of his adversary. There must exist reasonable ground for such belief at the time of the killing, and the existence of such ground is a question of fact for the jury.

Appeal from District Court, Tillman County; Frank Mathews, Judge.

A. J. Hunt, was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Hiles Hamilton, Wilson & Roe, P. Mounts, and W. M. Howenstein, for plaintiff in error.

The Attorney General, for the State.

DOYLE, J. In the information in this case, filed in the district court of Tillman county, A. J. Hunt was charged with the crime of murder, alleged to have been committed in said county on or about the 27th day of November, 1922, by killing one J. R. Hughes. On the trial the jury returned a verdict finding him guilty of manslaughter in the first degree, and assessing his punishment at imprisonment in the penitentiary for the term of seven years. He has appealed from the judgment rendered in pursuance of the verdict, but no brief has been filed, and no appearance made on his behalf in this court. The case was submitted on the record.

We shall first consider the assignment of error that the evidence was insufficient to sustain the verdict. It appears that the deceased, commonly known as "Jack" Hughes, lived at Grandfield, his wife and their child living with him until a few months before his death, when, owing to domestic trouble between the deceased and his wife, a separation took place. The defendant, a deputy sheriff, following this separation, took the wife of the deceased on several trips around the country.

Three or four days before the fatal affray, W. A. Roberson went to the home of defendant, about seven miles from Grandfield, and told defendant's wife that Mr. Hughes sent him there to talk to her, and see if she could get her husband to quit running around with his wife. The next day Mr. Roberson was talking to the county judge in the postoffice. Defendant came in and said to Roberson, "You are the damn son of a bitch that went out to my house and told that pack of lies." Roberson told him he had the wrong man, and defendant said, "Well, who ever went out there told a damn pack of lies, and it is going to wind up in a shooting or killing." The shooting occurred about 10 o'clock, in front of the Tillman County Bank.

Seven or eight witnesses testified that the defendant came out of the Tillman County Bank and walked up to where the deceased was talking to another man; some words passed between them, and one or two blows were struck; then the defendant pulled his gun, and the deceased caught him around the waist. The defendant, holding him with one hand, shot him, and he fell on the sidewalk. He was taken to a doctor's office, and remained conscious for about three hours, and died a few hours later.

Dr. Harper Wright testified:

"I was inside of the bank and saw them when they clinched in front of the window, and the shot was fired. I ran out, and Hunt said, 'Doc, you take him around and fix him up.' I called three or four other men, and we carried him around to my office. I dressed his wounds. The bullet entered the lower portion of the abdomen, and ranged downward; the intestines were badly torn, and the larger arteries were cut."

Several witnesses testified that after firing the shot the defendant put his gun in the holster, kicked Hughes' hat off the sidewalk, saying, "The son of a bitch," then

walked away, and returning took out a day book and asked who picked up the hammer. Some one said, "T. J. Tubbs," and after writing the name said:

"The God damn son of a bitch told my wife a lot of stuff. Any one who would do a trick like that ought to be burned at the stake."

The following written declaration taken by the county attorney was admitted:

"I, J. R. Hughes, believing and realizing that I am mortally wounded, and that the end is near, do in the presence of God and those present say that Mr. Hunt had been going out to see my wife and trying to get her to sue me for divorce. He called me a God damn son of a bitch, and hit me, and I struck him with my fist. He started to draw his gun, and I threw my hammer at him to keep him from getting it. After throwing my hammer we clinched, and while we were clinched he shot me." Signed by the deceased in the presence of nine witnesses.

On the part of the defense, Mrs. Alma Hunt, wife of the defendant, testified: That on the 23'd day of November, 1923, a man called at her home, asked for a drink, and after talking about land and leases said, "I am a Ku Klux, and the Ku Klux Klan has sent me here to tell you that Mr. Hunt will never come home; they are going to kill him tonight." That she asked him what for, and he said, "My name is Roberson; and I am going to prove to you that Mr. Hunt is untrue to you." He took a paper from his pocket and said, "Here are the names of the citizens that signed," and called over several names. And he said, "I have a letter here in my pocket to prove that Mr. Hunt is untrue to you." She said, "Let me see the letter." That she looked at it and said, "That is not Mr. Hunt's handwriting." Then he said, "Well, he has been running around with other women." She said, "He has to go out riding with other women to gather information from other people." He said, "Well, he has no right to gather information to send Jack Hughes to the pen." Then pulled a paper out and asked her to

sign it, and said, "It is to prove that you don't depend on Mr. Hunt for your protection or support"; and she refused to sign it. He said, "Listen; if you will sign the paper, and don't say anything about killing Hunt, the Ku Klux and K. P.'s will support you and your children the rest of your life." That she said, "He has not bothered any one, and they had better leave him alone." He said, "You had better not tell that I have been here; I am a Ku Klux." And he drew a Ku Klux cap from his pocket and slipped it on. My son stepped up to the door, and he rushed away.

As a witness in his own behalf, the defendant testified that he was a deputy sheriff, and, on request of Mrs. Jack Hughes' father, he made five or six trips with her to see witnesses to be used by her in her action for divorce; that his relations with her were in no way improper; that several persons, naming them, had told him that Jack Hughes had threatened to kill him; that his wife informed him that evening of what Roberson said to her; that when he came out of the bank Jack Hughes and another man were right in front of him; that he spoke to Hughes, saying, "Hughes, was you out at my house last week?" Hughes said, "No, God damn you, I was not at your house," and reached one hand to his hip; that he started to slap him, and Hughes dodged back, then turned and struck him on the shoulder with a hammer, then threw his arms around him, and he drew his gun, whirled Hughes around, and shot him in self-defense.

Several witnesses testified that the deceased had made threats against the defendant's life. The transcript of the testimony covers about 300 pages, but the foregoing is the substance of the material testimony.

It is obvious that the case was one for the consideration of the jury. Assuming that the deceased was the aggressor, the rule is well settled that the bare belief of one assaulted that he is about to suffer death or great personal

injury will not in itself justify him in taking the life of his adversary. There must exist reasonable ground for such belief at the time of the killing, and the existence of such ground is a question of fact for the jury.

It is assigned as error that the purported dying declaration of the deceased was admitted without proper predicate, because the evidence did not establish the fact that the deceased was then under a sense of impending death. An examination of the evidence on this question satisfies us that it was sufficient.

Several assignments of error are directed to the admission and rejection of testimony. We have examined them, and find no error in the rulings of the court in this regard. Several assignments are directed to the refusing of requested instructions, and to exceptions taken to the instructions given by the court. There is nothing in the objections to the instructions. Taken as a whole they correctly presented the law of the case, and were more favorable to the defendant than he had any right to expect.

While the defendant is not represented in this court, we have carefully gone through the record, and find it free from substantial error.

The defendant, from all the record discloses, had a fair and impartial trial. Under the evidence the defendant might well have been convicted of murder, and we think he ought to be thankful that the jury dealt so leniently with him.

The judgment of the lower court is accordingly affirmed.

BESSEY, P. J., and EDWARDS, J., concur.