## MELVIN PHELPS v. STATE.

No. A-9298. April 29, 1938.
(78 P. 2d 1068.)

Billingsley & Kennerly and Hill & Hill, all of Wewoka, for plaintiff in error.

Mac Q. Wiliamson, Atty. Gen., Tom Finney, Asst. Atty. Gen., and Tom Huser, Co. Atty., of Wewoka, for the State.

BAREFOOT, J. An information was filed in the district court of Seminole county charging the defendant with the crime of murder. He was tried, convicted, and sentenced to serve a term of seven years in the penitentiary, and has appealed.

The first two assignments of error were: (a) That the court erred in refusing to sustain a demurrer to the

evidence; and (b) that the evidence was insufficient to sustain the verdict.

The evidence revealed that on the 17th day of May, 1936, the deceased, Burford White, about 12:30 or 1 o'clock in the morning, came to the home of Anna Mae Horton, who lived about a mile west of Wewoka. He remained there about ten minutes and left. He had been keeping company with Anna Mae Horton. He had returned to her home about 1:30 or 2 o'clock a. m. Had been in the kitchen and was preparing to leave when the defendant, Melvin Phelps, and his companion, Bill Downing, came to the porch and hollered and wanted something to drink.

Anna Mae Horton testified that she told them she did not have anything to drink; that they wanted to come in and talk a while; she told them she did not want to get up and it was too late. She heard Bill Downing say to defendant, "I guess you are needing a drink after using that blackjack like you were over there a while ago," and the defendant answered, "Yes." That just at this time deceased, Burford White, who had been in the kitchen, came around the house on the outside, and stepped upon the porch where defendant and Bill Downing were at that time. Witness had gotten up and came to the door which was facing the east, standing inside the screen door. She testified that she asked the boys to go and get in their car and leave, and they would not do it, and she asked Burford to come in the house, and he said, "You go in there and I will be in in a minute," and then Bill Downing hit Burford. She saw something black in his hand, but she could not tell what it was. It was the theory of the state that he was hit by a blackjack, which was afterwards found by one of the officers on the ground at the scene of the difficulty. She further testified that just at this time "they all three went together there and went to fighting."

"Did you see Melvin Phelps standing on the porch when Bill Downing struck Burford? A. Yes, sir. Q. What did

Melvin do when Bill Downing struck Burford? A. He just jumped on Burford too and they kinda fell off the porch together."

In the fight which ensued both defendant and deceased were severely cut. The deceased had 18 cuts on his body, and the back of his head was bruised. From the wounds received the deceased died while being taken to the doctor's office in the city of Wewoka.

The undertaker, testifying as to the wounds on the body of deceased, said:

"Q. Where were the cut places on the body, Mr. Mc-Connell? A. Well, there were about five or six underneath the left arm, one severe cut underneath the ear to the middle of the throat, about eight inches long; one cut about ten inches long on the left thigh; about four or five cuts on the small of the back, and of course, there was one cut on the stomach. Q. You say there were 18 cut places in all? A. About 18, yes. Q. Were there any wounds in the abdomen or stomach? A. There was one. Q. Can you describe to the jury on your own body where that wound was? A. On the left side, ranging downward, about ten inches, which exposed the intestines. Q. How deep was that wound, if you know? A. It was deep enough for the intestines to come out. Q. How many of those wounds would you say were fatal wounds, Mr. McConnell? A. Oh, approximately three or four. Q. Mr. McConnell, from your examination, could you tell what caused those cut places or wounds? A. Well, they were caused by a knife. Q. Can you tell, as to the bruises, as to what caused them? A. Well, they could have been caused either by fists or some blunt instrument. Q. Could a blackjack have caused those bruises, Mr. McConnell? A. Could have."

Alberta Harrison, for the state, testified that she was a sister-in-law of Anna Mae Horton, and was staying at the home of her sister-in-law, with two small children, on the night of the difficulty, and was in bed in the southwest room adjoining the porch where the difficulty was had. She corroborated the testimony of Anna Mae Horton in full. Upon hearing the controversy she arose from her bed and

went to the door where Anna Mae Horton was standing; she saw the parties just as Anna Mae Horton had seen them. She testified as follows:

"Q. What did you hear next? A. Anna Mae, she started hollering and going on. She called me and I heard scuffling like and whenever she called me, I jumped up then and ran to the door and at the time them men was off the porch. They were standing off to one side. Q. What were they doing, if you know? A. Well, I guess they were fighting, but they were just standing grabbed in each others arms, and one of them had his arm raised above his head with something in his hand. Q. Did you know what that was in his hand? A. I couldn't tell. Q. What was Anna Mae doing? A. She was pushing Mr. Downing away from the other two men. Q. Pushing this other man away? A. Yes, sir. Q. Now, could you tell who the two men were that were locked together there off the porch? A. Well, it was Burford and Mr. Phelps. Q. Melvin Phelps, the defendant here? A. Yes, sir. Q. You went back and put your shoes on, I believe? A. Yes, sir; I did. Q. When you went back, did you go back on the porch? A. Yes, sir. Q. Did you see these men when you got back on the porch? A. Yes, sir. Q. Where were they then? A. Anna Mae still had Mr. Downing pushed away and she was standing there hollering and Mr. Phelps and Burford were on the ground fighting. They were lying down. Q. Did you see them fight or scuffle there on the ground? A. Yes. Q. How long did that fight or scuffle take place, if you know? A. About three to five minutes."

She further testified to the fact of the officer finding a blackjack with the handle torn off, a small pocket knife, a sack of Bull Durham smoking tobacco, and a black hat with blood in the crown, at the scene of the difficulty.

Allen Whitworth, a deputy sheriff, testified to seeing and talking to the defendant at the doctor's office, and at the county attorney's office. He testified that he admitted fighting with the deceased, who he claimed struck him, and that he cut the deceased; that he examined the premises early the next morning; that defendant had several cut places on his face and body, but none of them were serious.

"Q. Just tell what was said? A. He said that they had a fight out there and that he had cut Burford White. He admitted taking part in the fight and told how White had hit him and knocked him back against the porch and they went together on the ground and how they fought."

The above constituted the direct evidence of the state. A reading of the same clearly shows that the court did not err in overruling the demurrer to the evidence of the defendant. Defendant cites the case of Jones v. State, 20 Okla. Cr. 233, 202 P. 187, as upholding his contention. A careful reading of that case reveals an altogether different state of facts than is shown in the case at bar. While the court holds that where the homicide is admitted and proved there is no shifting of the burden of proof where the circumstances as proven on the part of the state reasonably tend to show that the fatal acts may have been done in self-defense, the court announces the law to be that even though the evidence on the part of the state may not be convincing, if there is any substantial evidence tending to prove the guilt of the accused, the question is properly for the jury, and a demurrer to the evidence, under such circumstances, is properly overruled. A reading of the Jones Case, supra, will reveal a very different state of facts than the case at bar. Fixico v. State, 39 Okla. Cr. 95, 263 P. 171; Hunt v. State, 29 Okla. Cr. 255, 233 P. 506; Whisenhunt v. State, 40 Okla. Cr. 50, 266 P. 792.

The defendant, testifying in his own behalf, corroborated the state's witnesses as to being at the home of Anna Mae Horton with Bill Downing on the night of the difficulty; that he went there for the purpose of buying a half pint of whisky. He testified that when Anna Mae Horton informed him that she did not have any whisky, she said: "You'd better go; Burford is here drunk and you will have trouble." He then testified that Burford, who had come around the house on to the porch where he was standing, said, "What in hell are you sons-of-bitches doing here," and he said: "Nothing, Burford, just talking a little bit," and

he says, "If you have got any talking to do, talk to me"; that when he said this Anna Mae jumped to the door and grabbed his hand and said, "Don't do that Burford, don't do that"; and he told her to go back in the house and he would be in there in a minute; that about this time Burford raised his hand and Bill Downing hit him with his fist and the fight started; that he tried to separate them and pushed deceased back, and that the deceased struck him in the head with a knife; that deceased cut both him and Bill Downing; that Burford White was a man who weighed 175 or 180 pounds; that he was drunk and that he knew he was a dangerous man; and that anything he did was in self-defense, believing that he was in danger of great bodily harm at the time.

Bill Downing testified in the case, but nothing in reference to matters surrounding the difficulty, only to one question of minor importance.

Several witnesses testified to the quarrelsome nature of the deceased while drinking, and several witnesses testified that he was drunk on the night of the difficulty.

On cross-examination the defendant testified that he had taken two drinks of whisky and two bottles of 3.2 beer just prior to the difficulty, and also testified to going with Bill Downing to several Choctaw beer joints and drinking Choctaw beer at different times, and also to having trouble with a negro and knocking him down with his fist. This was just prior to the time that they went to the home of Anna Mae Horton. Under this statement, and taking into consideration all of the evidence in the case, we do not think the court erred in refusing to instruct the jury to return a verdict of not guilty in this case.

The third assignment of error is:

"The killing with a knife being admitted, and the question of self-defense having been raised; it was reversible error to permit the state to prove that the defendant, some three or four hours before the fatal difficulty, assaulted W.

S. Chain at another place with a blackjack; and was looking for negro women."

This assignment has reference to the evidence of a witness who was placed upon the stand on rebuttal by the state. An information was filed jointly against the defendant and Bill Downing. It was the state's theory that the difficulty was brought about by Bill Downing making an assault upon the deceased, and that he struck him with a blackjack. There was evidence to substantiate this, and a blackjack was found by the officers near the scene of the difficulty. The defendant denied either of said parties had a blackjack, and we do not think that under these circumstances it was error to permit the state to prove that a few hours prior to the fatal difficulty, that defendant had struck another with an instrument of the same general character claimed to have been used at the time of the difficulty. This witness also testified that defendant asked him, "Did you know where any girls are?" This evidence was given in detailing the circumstances under which the witness claimed to have seen the defendants just prior to the difficulty, and while it had nothing to do with the case, it is not such a statement as, in our opinion, causes prejudicial error. It is not at all probable that it would have had any weight with the jury in determining the guilt or innocence of the defendant. The record also fails to show where defendant saved any exceptions to the introduction of this evidence, nor was any motion made by defendant to strike the same from the record. Keeler v. State, 24 Okla. Cr. 206, 217 P. 228; McCollum v. State, 57 Okla. Cr. 381, 48 P. 2d 872; Vickers v. United States, 1 Okla. Cr. 452, 98 P. 467; Williams v. State, 4 Okla. Cr. 523, 114 P. 1114; Tallon v. State, 22 Okla. Cr. 89, 210 P. 309.

The fourth assignment of error was:

"It was reversible error to exclude the evidence of the witness, David Wells, that the deceased, some 50 minutes before the fatal difficulty, on the road to the place where the difficulty occurred, was drunk; and said that he was drunk,

and that he was after some son-of-a-bitch, and that hell would be popping pretty soon."

A sufficient answer to this assignment of error that deceased was drunk would be that this evidence, if admitted, would only be cumulative. Graham v. State, 25 Okla. Cr. 372, 220 P. 967; Addington v. State, 8 Okla. Cr. 703, 130 P. 311. Not only several witnesses for the defendant testified that deceased had been drinking and others that he was drunk, but the chief witness for the state, Anna Mae Horton, testified:

"Q. The first time Burford came out was he drinking or intoxicated? A. He was drinking some. Q. He was drinking some? A. Yes, sir."

In the case of Rogers v. State, 8 Okla. Cr. 226, 127 P. 365, cited by defendant in error, it is shown that at the time of making the threats the deceased called Rogers by name and that they were clearly directed toward and against Rogers. The same is true in the case of Burroughs v. U. S., 6 Ind. T. 164, 90 S. W. 8. In the case at bar, the threat, and it could hardly be termed a threat, was made by deceased prior to the time he had gone to the home of Anna Mae Horton, and according to the testimony of the defendant himself, he at that time had no reason to know that he would meet or see the defendant. There is nothing in the record to show that this threat, if made, was directed to the defendant or Bill Downing, and was clearly inadmissible. The general rule is announced by Wharton on Homicide, 3d Ed., § 253, p. 415:

"Vague, indefinite threats of the deceased, not mentioning the accused, nor shown to have reference to him, are inadmissible in evidence in a prosecution for homicide upon the question of self-defense. And threats made by the deceased against one person are not admissible in evidence in a prosecution against another person for killing him." Wireman v. Commonwealth, 206 Ky. 828, 268 S. W. 586.

The fifth assignment of error is that the court erred in giving to the jury an instruction on mutual combat. There

is no complaint that the instruction did not properly state the law as to mutual combat, and therefore it is unnecessary to quote it. We have examined the instruction, and in our opinion it is in proper form and was justifiable under the facts in this case. Wharton on Homicide, p. 538, § 334, in stating what constitutes mutual combat, says:

"One who enters willingly into a combat and fights willingly, not for his own protection, but to gratify his passion by inflicting injury upon his adversary, engages in a mutual combat, which will prevent him from invoking the doctrine of self-defense."

The evidence of the defendant himself was that when his companion struck the deceased that the fight began and that he entered, voluntarily and willingly. The evidence on the part of the state was to the same effect. Under this evidence the court was justified in giving this charge. But the court also instructed the jury upon the law of self-defense, and in this charge the defendant was given every protection afforded him under the law. So if the defendant at any time, either before entering the difficulty, or after entering the same, acted in self-defense, the jury were given the opportunity under a fair instruction to so find. Wharton on Homicide, p. 269, § 171, says:

"If two persons fight and a friend of one of them comes in and takes part against the other and kills him, however, it is only manslaughter in the slayer, where he acted from passion aroused by the fight, and not from malice, though there may have been malice between the original parties."

Under the evidence in this case, we find no error in the instruction upon mutual combat.

The sixth assignment of error is:

"It was reversible error to refuse to give the defendant's requested instruction on the evidence as to who was the aggressor:

" 'Gentlemen of the Jury, you are instructed that should you believe or find from the evidence, or have a reasonable

doubt thereof, that the defendant, Melvin Phelps, sought to separate Bill Downing and the deceased while they were fighting, and that he did not strike the deceased first, then Melvin Phelps would not be the aggressor,' arising from the 11th assignment of error."

Under this contention defendant cites the cases of Brock v. State, 6 Okla. Cr. 23, 115 P. 1026, and Smith v. State, 51 Okla. Cr. 292, 1 P. 2d 814. We have read these cases and we do not think they sustain this contention. The facts in those cases are entirely different from the facts in the case at bar. Defendant contends that by reason of the court giving instruction No. 21, that it was error to fail to give the requested instruction heretofore quoted. Instruction No. 21 simply told the jury if they entertained a reasonable doubt as to whether the defendant was guilty of murder they should next inquire as to whether he was guilty of manslaughter in the first degree, which was followed by a proper charge upon manslaughter in the first degree. We fail to see how this charge could have prejudiced the rights of the defendant, and it is conceded in the brief of the state that it is the duty of the court to instruct upon the defendant's theory of the case, and this rule has been upheld by this court from its earliest days. Payton v. State, 4 Okla. Cr. 316, 111 P. 666; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735; Crittenden v. State, 13 Okla. Cr. 351, 164 P. 675; Davis v. State, 20 Okla. Cr. 203, 201 P. 1001; Miles v. State, 41 Okla. Cr. 283, 273 P. 284; Johnson v. State, 59 Okla. Cr. 283, 58 P. 2d 156.

In the case at bar, the defendant's theory was that he acted in self-defense, and the court gave an elaborate instruction covering the law of self-defense, and defendant was protected in every way and given every instruction to which he was entitled. But it was not necessary for the court, after giving instructions covering his theory, to particularize defendant's evidence, as was suggested by the requested instruction above quoted. The court did not in its instructions at any time attempt to limit the defendant's

right of self-defense on the theory that the defendant was the aggressor. The jury, after a careful consideration of the case, found the defendant guilty, and left his punishment to the court, who sentenced him to seven years in the penitentiary. He has been ably represented in this court. The briefs of both the state and defendant have been well prepared. We find no error in this record which justifies a reversal of this case, and the judgment of the district court of Seminole county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.