LEROY DICKINSON v. STATE.

No. A-4.    Opinion Filed November 15. 1909.

(104 Pac. 923.)

1.    ASSAULT AND BATTERY—Defense of Property—Deadly Weapon—Defense of Person. In a criminal prosecution for pointing a gun, the court instructed the jury, "that, if you find from the evidence that the prosecuting witness, Abe Wiebe, together with his assistants, were in the act of working upon the public highway and in the prosecution of the work got beyond the line of the road onto defendant's property, and were then plowing and scraping on his property, such being the fact, it would not excuse or authorize the defendant in assaulting the prosecuting witness, Abe Wiebe, by pointing a gun at him, in order to require him to desist from such work. No individual has any right to assault another with a deadly weapon by pointing a gun at him because of the fact that such person is trespassing upon the land of another." Held, correct in principle; but, in view of the evidence, it was the duty of the court to further instruct the jury that defendant had the right to go where the parties were trespassing upon his premises and request them to leave, and, if they did not accede to his request, that he had a legal right to expel them as trespassers therefrom. provided, that in so doing he did not use more force or violence than was reasonably necessary to effect that purpose, and that, if assaulted by such a trespasser, he had a right to defend his person, independent of the right of defense of his property.

2.    TRIAL—Refusal to Reopen Case—Evidence of Good Character—Admissibility. On the trial of a person accused of the commission of crime, he may offer evidence to show that his character was such as to make it unlikely that he would be guilty of the crime charged. Such evidence being essentially relevant, it was error to refuse to reopen the case for this purpose, under the circumstances stated.

(Syllabus by the Court.)

*Error from District Court, Woods County; J. L. Pancoast, Judge.*

Leroy Dickinson was convicted of pointing a gun at another, and he brings error. Reversed and remanded.

Leroy Dickinson, plaintiff in error (hereinafter designated defendant) was informed against in the probate court of Woods county, Okla. T., which information charged that he "did then and there unlawfully, wrongfully, and wilfully point a. deadly

weapon, to wit, a single-barrel shotgun at another person, to wit, Abe Wiebe." The cause was tried in said probate court, and the defendant was found guilty. From this conviction the defendant appealed to the district court of Woods county, Okla. T. Upon a trial there had the defendant was again found guilty. A motion for a new trial was filed and overruled. On the 5th day of October, 1907, judgment was rendered, adjudging the defendant guilty as charged, and that he be imprisoned in the county jail of Woods county, Okla. T., for a period of four months and to pay a fine of $100, and costs. From which judgment defendant appeals. On September 21, 1908, there was filed with the clerk of this court a case-made and petition in error. At the September, 1909, term the cause was submitted.

That part of the evidence which we deem necessary to present the errors on the trial complained of is as follows:

The prosecuting witness, Abe Wiebe, testified that he was road supervisor in Liberty township, and that on the 2d day of January he went with two men to work the road; that the defendant came along where they were plowing and ordered them off; that he had a single-barrel shotgun; and that he cursed and abused witness and presented the gun. On cross-examination he testified as follows:

"Q. How did he hold the gun? A. [Indicating] He held it about this shape. Q. Did he have the gun to his shoulder? A. No. Q. He wasn't looking down the sights of the gun and pointing at you? A. No. Q. How far was he from you? A. [Indicating] As far as from here to that corner. Q. And he was cursing you all the time? A. Yes, sir; he was. Q. And you say you were not on Dickinson's land at that time? A. Why, I was on a section line according to my best judgment. Q. But you know now, do you not, whether you were or not? A. After it was surveyed out, I seen that I was a little on one side of the section line. Q. Then what happened about pointing the gun? What did he do then? A. He stood there a while and cursed me and abused me, and I talked to him, and said, 'It would be better if you had talked to me like a man,' but he wouldn't heed nothing. Finally he let the gun down, set it on the ground and held it by the barrel this way, and kept abusing me right along, and finally I got

tired of it, and I said, 'Mr. Dickinson, if you think you can abuse me in any kind of a way you want to, you are off,' and I made a step, and Pullan stopped me, and he hauled off and said: 'Let him come. It will be the last time he ever comes. He will never come again.' Q. Who said that? A. Leroy Dickinson. Q. How close were you to him then? A. I didn't make any advance at all. Q. How close were you to him when this occurred? A. Just about the same distance. Q. And he had the gun with the butt of it down on the ground? A. Yes, sir. Q. And in the quarrel did he raise the gun up? A. Yes, sir [indicating]; he took the gun this way and hauled off. Q. Did he point it at you? A. No; he was going to strike me with it. Q. And he stood there with the gun? A. No. Q. What did he do? A. While we went to load up, he walked off toward his brother's."

J. W. Pullan and J. E. Lord, witnesses on behalf of the territory testified in substance to the same state of facts.

Defendant, testifying on his own behalf in part testified as follows:

"Q. State whether or not on the 2d day of January, this year, you had a difficulty with these gentlemen. A. I did. Q. Tell the court and jury just exactly what occurred and where it was. A. Well, it was nearly 20 rods, or a little better, from the corner, and it was over on the land that I had, that was my land, 40 rods or a little better. I saw them working on this hill and saw that it was on my land. I says, 'I'll go over there and have them desist from working on my premises.' I went over there with that intention, and I told Mr. Wiebe when I went over there, I says 'What are you folks doing?' 'Oh,' he says, 'we're just having a little fun.' 1 says, 'This ain't very good fun.' 'Now,' I says, 'I'd like to have you quit and get off my premises and leave it alone.' I said: 'I want you to find the section line. I want you to find it, and I want you to keep it.' Then he commenced and says, 'Why didn't you come like a man and tell me?' I says, 'There ain't no man about you, for,' I says, 'you came right before the commissioners here and told them lies.' Well, I told him to leave there, and after I told him to leave, he said he would go on and work it, and I said, 'After you get it worked, I'll put a fence across it in the other township.' I said, 'You would have no right to go over there and open it.' We had some little words about it, and he got Mr. Lord down nearly 20 rods as a witness, claiming that I had threatened him. I said, 'If a man comes without any right

and goes to work on my premises, without my consent, I might do something to him.' That was my remark, but I did not point the gun. The gun was carried on my shoulder all the way down. When I alked to Wiebe I dropped it, like that [indicating], and talked to him until I went away. Q. Did Wiebe make any effort to get toward you at any time while you were there talking? A. Yes, sir. Q. And what did you do then? A. As he stepped toward me, I stepped back and let the gun draw through my hand this way. Q. At the time you stepped back did you have the muzzle pointed toward him? A. No. Q. At any time during the argument with Wiebe, did you point the muzzle of this gun toward him? A. Not unless it was when I took it from my shoulder and dropped it this way. Q. With the butt toward the ground? A. Yes, sir. Q. Did you curse Mr. Wiebe? A. No. Q. What was the language you used toward Mr. Wiebe? A. I just talked earnestly, for cursing and swearing is something I never do; I don't think there is a man in Oklahoma that has heard me swear. Q. And you carried your shotgun down there? A. Yes, sir; on my shoulder. Q. Explain to the jury why you carried your shotgun down there. A. Mr. Wiebe has got a reputation in that neighborhood of being that kind of a man. He has chased people around the house, and— Q. You expected trouble, then, did you? A. I didn't know what to expect. Q. You just took it along? A. For my own body protection. Q. You knew, did you, that you might need protection? A. I knew the man."

There was no evidence as to whether the shotgun was loaded or not.

*T. J. Womack,* for plaintiff in error.—Upon duty of court to instruct jury upon *all* the law applicable to evidence adduced: Wilson's Rev. & Ann. Stat., sec. 382, par. 5518; 12 Cyc. 612 b.; *Milton v. State,* 6 Neb. 136; *Ainsworth v. State,* 11 Tex. App. 339. Upon the right and extent of use of force by a person in defense of person or property: *U. S. v. Wiltberger,* 3 Wash. C. C. 515; *State v. Vance,* 17 Ia. 138; *Combs v. State,* 9 S. W. 655; *Kendall v. Com.* (Ky.) 19 S. W. 173; *Crawford v. State,* 90 Ga. 701; *State v. Smith,* 30 Pac. 679; *Powers v. People,* 42 Ill. App. 427. Upon duty of court to admit evidence showing good character of accused: *State v. Northup,* 48 Ia. 583; 1 Bishop Crim. Proc. (3rd

Ed.) sec. 1115; Whar. Crim. Ev. (9th Ed.) sec. 66; *People v. Ahe*, 44 Cal. 288; *Reinson v. People*, 43 N. Y. 6.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

DOYLE, JUDGE, (after stating the facts as above.) The statute upon which the information in this case is based (Wilson's Rev. & Ann. St. 1903, § 2510) reads as follows:

"It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise."

The first question presented arises upon the following assignments, which will be considered together:

"(1) That the court erred in failing to instruct the jury upon all the law applicable to the evidence adduced in the trial of the said action. (2) That the said court erred in giving the following instruction to the jury, to wit: 'You are further instructed that, if you find from the evidence that the prosecuting witness, Abe Wiebe, together with his assistants, were in the act of working upon the public highway, and in the prosecution of the work got beyond the line of the road onto the defendant's property, and were then plowing and scraping on his property, such being the fact, it would not excuse or authorize the defendant in assaulting the prosecuting witness, Abe Wiebe, by pointing a gun at him in order to require him to desist from such work. No individual has any right to assault another with a deadly weapon by pointing a gun at him because of the fact that such person is trespassing upon the land of another.' "

No error is manifest in the instruction quoted. It is a correct exposition of the law. A mere trespass upon the land of another, even after the trespasser has been warned to depart and has refused, does not justify the landowner to use a dangerous or deadly weapon to resist the trespass, so if one offers to strike with a deadly weapon, although he announces his purpose not to finish the act and commit the homicide if his terms are instantly complied with (although the terms be such as he has a right to exact and enforce by the rule *moliter manus imposuit*), he is guilty of an assault. The putting in use of a deadly weapon shows a wanton disregard of human life. Clark in his work on Criminal

Law, at page 145, lays down the proposition in this terse and explicit language:

"A person may resist a trespass on his property, real or personal, not amounting to a felony, or removal or destruction of property not feloniously atttempted, by the use of any reasonable force, short of taking or endangering life; but, if he is unable to prevent it, and there is no felony attempted, he must suffer the trespass and the loss of property, and seek redress at the hands of the law, rather than commit homicide."

See, also, *State v. Smith,* 12 Mont. 378, 30 Pac. 679.

The defendant further contends that the court erred in failing to instruct the jury upon all the law applicable to the evidence adduced upon the trial. Section 5518, Wilson's Rev. & Ann. St. 1903, provides:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict," etc.

We believe, under the evidence as shown by the transcript, the court should have further instructed the jury in regard to defendant's right to defend against an unlawful trespass or intrusion upon the premises of the defendant, otherwise the jury might be disposed to regard his act of going to the place armed, and requesting the prosecutor to leave the premises, as placing him in the attitude of a wrongdoer; and, if his testimony is to be believed in this respect, he acted within his rights in the protection of his premises and his person.

Section 2233, Wilson's Rev. & Ann. St. 1903, provides:

"To use or to attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases: * * * Third. When committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense."

As we view it, the evidence raises two issues on self-defense: First, defense of property; and, second, defense of person. The defendant had a right to go where the parties were intruding upon

his premises and ask them to leave; and, if they did not accede to his request, he had a legal right to expel them as trespassers therefrom, provided that in so doing he did not use more force or violence than was reasonably necessary to effect that purpose. The defendant testified that he carried the shotgun for his own protection, and not for the purpose of expelling the trespassers. He says he did this because the prosecuting witness, Wiebe, had the reputation of being a quarrelsome and dangerous man. Wiebe admits that he made a threatening demonstration, and that Mr. Pullan stopped him, and that defendant, then holding the gun by the barrel, drew it back as if to strike him as he was advancing upon him. Against this attempted assault the defendant had the right to defend his person, independent of the right of defense of his property. We are of the opinion that under all the circumstances of the case an instruction embodying the views hereinbefore expressed should have been given to the jury.

3. The next question to be considered is:

"That said court erred in refusing and ruling out evidence offered by the plaintiff in error of his good character, and of the trait of being a peaceable and law-abiding citizen."

Under this assignmeent the record shows that, prior to the adjournment for the day, the defendant rested his case, and court adjourned for the day. Counsel for defendant, upon the convening of the court, asked leave of the court to reopen the case for the purpose of offering evidence of good character of the defendant as to being a peaceable and law-abiding citizen. Counsel for the territory objected. The court sustained the objection and refused to reopen the case. It is contended that in this the court erred, and "that the ruling of the court was such an abuse of discretion as amounted to prejudicial error and denial of a substantial right of the defendant to place his previous good character in the scales of justice to be weighed by the jury with the other facts adduced in the course of the trial." We are constrained to sustain the contention that the refusal of the court to reopen the case and admit evidence of the good character of the defendant was such an abuse of judicial discretion as, under the

circumstances, materially affected the substantial rights of the defendant. It is not necessary to cite authorities to show that in a criminal prosecution the accused will be allowed to call witnesses to show that his character was such that would make it unlikely that he would be guilty of the particular crime of which he is charged. When a person is charged with crime, the courts of our country permit the question of good character of the accused to be put in issue by the accused before the jury. The theory, as we view it, is a wise one. If a man in a community where he lives, by his association among his neighbors, has built up in the years of his life, be they few or many, a character among them for good morals, and of being a peaceable and law-abiding citizen, it is only right that the jury should know that fact.

As was said by Willes, J., *In R. v. Rowton, Leigh & C.,* 520, 540:

"It is a mistake to suppose that, because the prisoner only can raise the question of character, it is therefor a collateral issue. It is not. Such evidence is admissible because it renders it less probable that what the prosecution has averred is true; it is strictly relevant to the issue."

In *Cancemi v. People,* 16 N. Y. 506, Strong, J., said:

"The principle upon which good character may be proved is that it affords a presumption against the commission of crime. This presumption arises from the improbability, as a general rule, as proved by common observation and experience, that a person who has uniformly pursued an honest and upright course of conduct will depart from it and do an act so inconsistent with it. Such a person may be overcome by temptation and fall into crime, and cases of that kind often occur, but they are exceptions; the general rule is otherwise: The influence of this presumption from character will necessarily vary according to the varying circumstances of different cases. It must be slight when the accusation of crime is supported by the direct and positive testimony of credible witnesses; and it will seldom avail to control the mind in cases where the testimony, though circumstantial, is reliable, strong, and clear. But in cases where the other evidence is nearly balanced, but slightly preponderating against the defendant, the presumption from proof of good character is entitled to great weight,

and will often be sufficient to turn the scale and produce an acquittal."

Prof. Greenleaf in language used by Mr. Justice Patterson in *Rex v. Stannard,* 7 C. & P. 673, says:

"I cannot in principle make any distinction between evidence of facts and evidence of character. The latter is equally laid before the jury as the former, as being relevant to the issue of guilty or not guilty. The object of laying it before the jury is to induce them to believe, from the improbability that a person of good character should have conducted himself as alleged, that there is some mistake or misrepresentation in the evidence on the part of the prosecution, and it is strictly evidence in the case." (3 Greenl. on Ev. § 25.)

See, also, *Wells v. Territory,* 14 Okla. 436, 78 Pac. 124.

Defendant's good character, as indicating the improbability of his doing the act charged, being essentially relevant, this evidence would have gone to the jury with special force, as under the evidence the commission of the offense charged seems doubtful.

For the reasons stated, the judgment of the lower court is reversed, and the cause remanded.

FURMAN, PRESIDING JUDGE, and OWEN, JUDGE, concur.