## C. I. BUCHANAN v. STATE.

No. A-4087. Opinion Filed Nov. 6, 1923.
(219 Pac. 420.)
(Syllabus.)

1. **Weapons—Pointing Deadly Weapon—Proof of Intention Vital.** In a prosecution, under section 1999, Comp. St. 1921, for pointing a pistol or other deadly weapon at another, the proof must show an intentional pointing of the weapon.

2. **Same—Terms "Point" and "Aim" Defined and Distinguished.** The word "point" is not entirely synonymous with the word "aim." "Aim" denotes direction toward some minute point in an object, while "point" implies direction toward the whole object; but the word "point," as used in Comp. St. 1921, § 1999, supra, implies intention, and in that respect is similar to the word "aim."

3. **Same—Evidence Insufficient to Sustain Conviction.** For evi-

dence held to show no intentional pointing of a gun at another, see body of opinion.

4. **Assault and Battery—Right to Use Necessary Force to Prevent Unlawful Interference with One's Property.** A person in the lawful possession of real or personal property has the right to use necessary and sufficient force to prevent a trespass or other unlawful interference with such property.

5. **Trial—Right to Affirmative Instruction on Defenses.** When requested, the defendant is entitled to an affirmative instruction covering any defense interposed, when there is evidence tending to support such defense.

Appeal from County Court, Lincoln County; Ira E. Billingslea, Judge.

C. I. Buchanan was convicted of the crime of pointing a weapon at another, and he appeals. Reversed.

James Embry, for plaintiff in error.
The Attorney General, for the State.

MATSON, P. J. Appeal from the county court of Lincoln county. Conviction for pointing weapon at another, with punishment assessed at fine of $50 and imprisonment in county jail for three months. Among errors assigned are the insufficiency of the evidence to support the verdict and refusal to direct the jury to find defendant not guilty.

This prosecution is based on sections 1999 and 2000, Compiled Statutes 1921, which read as follows:

"It shall be unlawful for any person to point any pistol or any other deadly weapon, whether loaded or not, at any person or persons, either in anger or otherwise.

"Any person violating the provisions of the three preceding sections shall, on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred, and shall be imprisoned in the county jail for not less than three nor more than twelve months."

The very essence of the offense defined by section 1999,

supra, is the "pointing of a pistol or deadly weapon at another." If the state failed to prove beyond a reasonable doubt that defendant "pointed" the deadly weapon at another, the prosecution must fail. We find no proof of the material element of the offense in the record of the evidence before us.

The information in substance charged defendant with having on the "29th day of April, 1921, pointed a shotgun at one Noah James." Noah James on this point testified:

"Q. What happened that day when you went there with Reynolds? A. Buchanan asked Mr. Reynolds if he made a deal, and Reynolds said, 'Yes,' he rented it. He said, 'That is all right with me; whatever you and Mr. James does is all right with me.' Q. What else happened? A. He said it was all right, and then he said—it has been so doggoned long—'it is all right, but I have to put this hay away; it looks like rain.' He threw it off, and I dragged it in the smokehouse, and put it back in the smokehouse for him. When the hay was put away, Mr. Reynolds said, 'It is getting late; we had better get home.' Reynolds had to take me home first. I expected to come there that evening and have a talk with Reynolds. He says, 'That is all right;' then says he— Q. Just tell what happened out there. A. He said that was all right, and I said to Mr. Reynolds, 'We had better go, it is getting late'; and Buchanan spoke up and says, 'I will just stay here until fall;' and I said to Mr. Buchanan, 'I don't see how you can stay here at all; you have not complied with your contract at all.' He jumped like this, and shook his hands, and said, 'I can whip hell out of you.' I said, 'I guess you can; I am an old man.' He said, 'I can,' and went into the house and got a single-barreled shotgun and set with it in just about this shape, stepping behind the —Q. And he said what? A. He said, 'You cannot cuss me like you did Lickliter.' I said, 'I did not cuss Lickliter;' he cussed me, and went on to tell him what he told me. Q. We do not care about what Lickliter told you? A. That is what he said. Q. What was done then? A. He took his gun

and laid it upright in his wagon, and he climbed into his wagon. The gun was lying there, the breech of it down, and the muzzle laying in the front of the bed. Q. What did you do? A. The car followed him out to the gate, right behind him. He took this gun out to the wagon with him, and he went with the gun and flipped the wire out, and Mr. Reynolds drove on ahead of him. I went to the right, and he to the left, and I said to him, in the conversation before we drove out, 'Will you give me $175 the same as Mr. Reynolds?' if he wanted to stay, and he said, 'No,' he did not 'want the God damned thing.' He did not want it, and he left. That is all of it, gentlemen.''

On cross-examination he testified:

''Q. Did he have the gun in his hand when you told him he was down and out? A. Yes, sir, and had it in this position, holding it in his arm, ready to fire. Q. And you told him he was down and out, right in the face of that gun? A. I was not afraid of him; no, sir. I was not afraid of any of you people; no sir, nor you either. Q. And you were looking right in the end of this gun, when you told him he was down and out? A. I don't know as I was looking right in the gun; the gun was pointing toward me.''

J. F. Reynolds, a witness for the state, testified, touching the pointing of the shotgun by defendant, as follows:

''Q. Now, you say that he came out of the house with a gun? A. No; he had the gun in both of his hands, and went and laid it over in the wagon. Q. Did he point it at any one? A. I did not see him. Q. You were watching the gun, and he was there in your immediate presence? A. I did not pay much attention to the gun; I was only watching to see he did not shoot me. Q. You did not think he intended to shoot any one? (Objected to as immaterial, and sustained). A. I think this man did not want to be jumped onto. Q. Could he not have shot him one-half a dozen times, if he had wanted to? A. I suppose so; he went on out of the place ahead of us. Q. That ended the conversation, and you called back to know if he was coming down, and

he told you he would. Q. Except his bringing the gun out, and the other man saying he forfeited the contract, there was no further trouble out there? A. Not in particular; no, sir. Q. You did not see him pointing the gun at any one? A. No, sir; I did not see him point the gun at anybody.''

Henry Reynolds, for the state, testified in part:

''Q. Were you over at the James place in April of this year, when there was some trouble over there? Tell this jury what happened there. A. There did not much happen, I did not think. Buchanan told us to go and get Mr. James, and whatever deal was made with him was all right. We came back over there, so Mr. James could get Buchanan's contract, and we could rent the place, and they got into a squabble there. I could not say how it came up, but Buchanan went in the house and got his gun, and told him, if he was there for trouble, why he could have it. That is all I heard.''

Cross-examination by Jas. A. Embry:

''Q. You did not pay enough attention to tell it or explain it. Did he not talk vilely—I mean, James talk vilely? A. No, sir. Q. To him about renting the place? A. No, sir; I believe he told Buchanan that he had broken his contract some way or another, and so they got into a squabble over it. Q. And said he would have to get out? A. Yes, sir. Q. And you don't know what Buchanan said to that? A. No, sir. Q. And James followed Buchanan over to the smokehouse? A. I don't remember; I was on one side of the wagon, and they were on the other, and I did not pay any attention to it. Q. Did you ever see Buchanan point a gun at any one there? A. No, sir; I did not. Q. Did you see Buchanan come out of the house and put it in the wagon? A. Yes, sir. Q. And he did not point the gun at any one? A. No, sir. Q. And after putting the gun into the wagon, he opened the gate and passed out. This is all you saw? A. Yes, sir.''

W. A. James, son of the prosecuting witness, touching the point in controversy, testified as follows:

"Q. I wish you would tell this jury just what happened out there. After you got out there at the place, just tell from beginning to end what happened. A. Well, they talked the matter over there, and it seemed to be all right with the parties, and papa asked him (Mr. Buchanan) when he could give possession, and he said, 'No; he would not give possession; he would stay there on the place;' and papa said, 'No; he could not stay, and the man have the place, too.' And Mr. James said, 'Well, you have not complied with your contract either;' and he jumped out of his wagon, and came over to him, and said, 'You cannot treat me that way,' and cussing around, and said, 'You cannot treat me like that;' and he went into the house and got his gun, and, with it in his hands, with an oath, he said, 'I can use that.' Q. He came out of the house and with an oath he said, 'I can use this?' Q. All right; what happened after that? A. Well, Mr. Buchanan went and got into the wagon, and drove on off and out of the gate, and we all went on home. Q. Assuming your father was just to the right of him and you were near the cellar, which way was the cellar from there? A. It was right from me, but left of Mr. Buchanan. Q. I am talking about right and left now? A. I was on the right from Mr. Buchanan. Q. Yes; then your father must have been between you and Buchanan, or nearly so? A. No, sir; anyway, I was north and west from where my father stood. Q. From where you stood could you see how the gun was pointed? A. It was pointed southwest from me. Q. Now, what direction was that from your father? A. That would be southeast from me. Yes, sir; Papa was southeast of me. Q. And the gun was pointed southwest and you were on over by the cellar? A. Yes, sir. Q. Who was the closest to the gun when he came out with the gun? A. Papa was. Q. And all right then, if he was southwest of the man pointing the gun; which direction were you from either of them? A. Northwest of my father and very nearly west of Buchanan. Q. Then you were looking at the gun from the side? A. Yes, sir; very near."

For the defendant, Mrs. C. I. Buchanan testified:

"Q. After the conversation there, what did your husband and James do? A. They had a little trouble. Mr. James came out there, and he was talking fighting all of the time. He wanted my husband to get off of the place, and said he would not do it. Q. Tell what all was done there before you went off to get the second load of hay. Did you see a gun there that morning? A. My husband went and picked up his single-barreled shotgun. I said, 'You had better not hold it that way; it might go off;' and he picked it up. He laid it down flat in the wagon. I said, 'You had better not lay it that way; it might go off; the jar of the wagon, you know, might let it go off.' Q. Where were you when your husband came out of the house? A. I was getting into the wagon. Q. How far were you from your husband? A. About as near as to that receiver there. Q. When he came out, what did he say? A. 'If you people want to go on the war-path, I am ready,' is all he said. Q. What did he do? A. He picked up the gun, and picked it up and drove with his right hand. Q. Where did you go? A. He carried the gun in one hand, and drove on through, and the car went on ahead of us. We drove to one side, and let them by before I drove out.''

The defendant testified:

"Q. What else did he say? A. He told me I had forfeited my contract. When he told me that, it made me mad. I told him he could whip Lickliter, but he could not whip me. I went and got my gun. There were four men there to dispossess me, and I did not propose to go against all of them without a gun. Q. What did you do with the gun? A. Took it out of the house in my hands and put it in the wagon. Q. Did you point that gun at any one? A. No, sir. Q. Did you expect to point that gun at any one? A. I did not. Q. Where was James then? A. My wagon was pointed east, sitting in the south, and laid the gun into the wagon and drove off. I said to the fellows, 'If you fellows are on the war-path, go to it.' Q. Did you wait for them to go? A. First I went in front of them, and threw the latch of the gate, and let them go through. Q. What had you started

for? A. After a load of hay."

The evidence, considered from the standpoint most favorable to the state, does not prove any intentional pointing of the shotgun by defendant at Noah James. At most, the state's evidence only tends to prove that at one time, while defendant was carrying the shotgun in his arm, on his way from his residence to his wagon, it may have been pointing toward the prosecuting witness, Noah James. This much may only be gleaned from the testimony of James himself.

Neither of the Reynoldses nor W. A. James, the son of the prosecuting witness, all of whom were present at the time it is contended this alleged offense took place, and all of whom were witnesses for the state, testify that defendant at any time pointed the shotgun at Noah James. The testimony of these eyewitnesses supports the testimony of the defendant that he did not so point the shotgun, and leaves the conviction to stand alone on the inference deducible from Noah James' testimony that at one time the shotgun may have pointed "toward him"—presumably in the general direction of him.

Seven witnesses testified that the general reputation of Noah James for truth and veracity was bad. True, five other witnesses testified to the contrary; but, eliminating from consideration the question of whether or not Noah James was or was not to be believed (a question solely for the jury), we think that his testimony is not sufficient alone to prove the guilt of this defendant or to support this judgment.

There must have been an intention on the part of defendant to point the gun at another before a conviction should result. While the word "point" is not entirely synonymous with the word "aim," in that "aim" denotes direction toward some minute point in an object, while "point"

implies direction toward the whole object, it is apparent, we think, that the statute was never intended to include inadvertent or unintentional acts of pointing. Livingston v. State, 6 Ga. App. 805, 65 S. E. 812; Coleman v. State (Miss.) 48 South. 181. No intentional pointing of the shotgun is shown by this record, even by the testimony of Noah James, and the testimony of all the other witnesses is to the effect that the defendant at no time pointed the gun at Noah James.

It is undisputed that defendant was at a place where he had a right to be. He had the right to use necessary and sufficient force to prevent a trespass or other unlawful interference with real or personal property in his lawful possession. Section 1762, Comp. Statutes, 1921.

The trial court refused to instruct on that issue. There appears enough evidence to warrant the giving of an instruction along the line requested. Dickinson v. State, 3 Okla. Cr. 151, 104 Pac. 923. We conclude that there is no evidence in this record sufficient in law to sustain this conviction, and, further, that the trial court should have instructed, after such request, on defendant's right to use force to prevent a threatened trespass or other unlawful interference with real or personal property in his lawful possession.

Conviction reversed.

BESSEY and DOYLE, JJ., concur.