## N. P. JOHNSON v. STATE.

No. A-9045. May 18, 1936.
(58 Pac. [2d] 156.)

284

John M. Goldesberry and Gerald B. Klein, for plain-tiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error, herein referred to as the defendant, was convicted of manslaughter in the second degree, and his punishment fixed at confinement in the Tulsa county jail for a period of one year. The information, omitting formal parts, charges that N. P. Johnson on the 6th day of November, 1934, in Tulsa county, "did unlawfully, wilfully and feloniously, and

without a design to effect death, and in a heat of passion and in a cruel and unusual manner, did then and there effect the death of one J. D. Thomason, by then and there striking the said J. D. Thomason with his fists, in and upon the neck and mouth, with such force and violence that the said J. D. Thomason was knocked to the side-walk, and thereby causing the skull of the said J. D. Thomason to be fractured, then and there and thereby inflicting in and upon the head, neck, body and mouth of the said J. D. Thomason, certain mortal wounds from which mortal wounds the said J. D. Thomason did then and there languish and die, contrary to," etc.

The record shows that on the first trial of this case the jury failed to agree, and on April 12, 1935, the court declared a mistrial and directed the case to be set on the next jury docket.

On June 25th the court overruled defendant's motion for a new trial and rendered judgment in pursuance of the verdict.

This case comes here upon exceptions taken to the rulings of the court upon the admission of evidence on the part of the state; exceptions taken to certain instructions given and instructions refused; exceptions taken to remarks of the assistant county attorney in his closing argument, and that the verdict of the jury was contrary to the law and the evidence.

The following facts appear from the evidence: The defendant with his wife and two daughters resided at No. 2624 East Eighth street, Tulsa. The deceased was employed by the Federal Housing Administration as a canvasser or enumerator, whose duty it was to take a certain section of the city assigned to him and cover it by calling at each house to solicit information as to whe-

ther any repairs were to be made there, and, if the party living in the house was not the owner, to take the owner's name.

On election day, November 6th, J. D. Thomason called at the home of the defendant, who at the time was talking on the telephone, and his wife answered the call at the door. The deceased told her about what he wanted, she told him the house did not belong to them, that they were only renting it, he asked her who the owner was, she turned and asked the defendant the name of the owner, and he told her. Shortly after the defendant started out to go to the post office substation to mail a letter. Passing out through the screen door, he told the deceased that they did not own the property and asked him to go on about his business and not disturb his wife any longer. He then went on to mail his letter; returning about 20 minutes later, he found the deceased still there talking to his wife on the porch. The deceased handed a paper to her and said, "Sign it"; the defendant said, "You don't have to sign anything, Don't sign it." As he stepped up on the porch, he said to the deceased, "I have told you two or three times to go on about your business." An altercation ensued when about midway between the steps of the porch and the step to the sidewalk, the defendant struck the deceased with his fist in the face, knocking him down. He was taken to a hospital. On the Friday following Mr. Thomason died; an autopsy showed that hemorrhage of the brain caused death.

The only state's witness claiming to be an eyewitness was Mrs. Birdie James. She testified:

"I was visiting my two daughters, they live in the same house at 2626 East Eighth street, which is the second door west of the home of the defendant. I was sitting in

the swing on the front porch. I saw this old man Thomason come out of the house and Johnson was right back of him. I saw Johnson knock Thomason's hat off and his glasses too. Johnson hit him on the back of the head with his right hand. Mrs. Johnson went to where he was and wiped the blood from his face. A car came there and they put him in the car and took him to a hospital. About the time of this difficulty I saw the mailman pass."

Dr. D. O. Smith testified that he attended the deceased, and described the wounds as follows:

"There was one in the face, right side of the upper lip, extending upwards, three upper teeth were out, and there was an abrasion about three-fourths of an inch long, with a puncture wound about the size of a dime about two inches back on a level with the top of the right ear. That this wound most likely caused the hemorrhage that resulted in death."

Eugene Hilburn testified:

"I was taking people to the polls out there. I drove up to Mr. Johnson's house. Mr. Thomason was sitting on the step to the sidewalk. Mrs. Johnson was taking care of him. She said, 'Call a doctor and bring a glass of water.' I went in to call a doctor and Mr. Johnson told me to take him to the hospital. Mrs. Johnson, another fellow, and myself put him in my car and we took him to the hospital. Arriving there, Mrs. Johnson got him a room and made arrangements for him to be treated."

At the close of the state's evidence, the defendant demurred to the evidence and moved the court to direct the jury to return a verdict of not guilty upon the ground that the evidence wholly fails to show the use of any dangerous weapon and fails to show that the killing was done in a cruel and unusual manner. The demurrer was overruled. Exception.

H. O. Hostetter testified that he was a mail carrier in the district including East Eighth street, was engaged

in his afternoon trip on election day. The first thing that directed his attention was a scream, was walking and looking over that way, and saw three persons walking from the porch steps. Mrs. Johnson was about on the bottom step. The two men took three or four steps close together, shoulder to shoulder, then Mr. Thomason swung around quickly, and there was a struggle, did not see a blow struck, but Mr. Thomason fell across the concrete walk, but was up on his elbow when he passed. That he had two or three houses to serve, and, when he came back, Mr. Thomason was sitting up, had a glass of water and was rinsing his mouth. Mrs. Johnson was kneeling on the sidewalk by him. That he would judge it was 12 feet from the porch steps out to the step down to the sidewalk.

Mrs. Johnson, wife of the defendant, testified:

"I was in the bedroom. Mr. Johnson was busy at the telephone and I answered a call at the door. I had been ill, and it was the first day I had been up for several days. I almost had a nervous breakdown. The caller told me he was Mr. Thomason and was taking a census of homes for the Federal Housing Plan. He said the house needed paint. I said, 'We don't own it, we just rent it,' and I told him why we could not put any repairs on the place. He asked for, and I gave him, our names. He took down the number of the house and the name of the man who owned it. I told him he must be the fifth or sixth person who came here the last two weeks getting that same information. He asked me who I paid the rent to. I told him, saying, 'I guess that is about all,' and started to close the door. He said, 'Oh, no, it is not all, I am sent out to get this information, that is what I am paid for, and I am going to get it.' Mr. Johnson put on his coat and hat. He told Mr. Thomason that was all the information he could get, that he could not come on people's porches and talk to them like that, and as he went out the door he told him to go on about his business. Mr. Johnson had a letter in his hand and was hurrying

away to mail it before the pick-up over there. Mr. Johnson was gone about fifteen minutes, Mr. Thomason said that I misunderstood what he meant in the first place, asked other questions and was writing down the information. Just before Mr. Johnson came back he asked me if I would sign this paper, I stepped out on the porch and said, 'Do I have to sign this?' He said, 'Yes, you have got to sign it.' Just as was saying that Mr. Johnson was coming up the walk, and he said, 'Oh, no, don't you sign anything.' He came up on the porch, picked up the papers on the stub post and handed them to Mr. Thomason and said, 'Now, you take your papers and get on off from here, you have been here long enough, and caused enough trouble,' and he took him by the arm and led him down the steps of the porch and said, 'Now, you go on off.' Mr. Thomason suddenly turned around and said he could not put him off like that, just something tot that effect. Mr. Johnson started on to put Mr. Thomason off the place. I screamed and told Mr. Johnson to go in the house. I ran in and got a glass of water and a towel. Gene Hilburn drove up and I sent him in for a glass of water and told him to call a doctor. He came back presently and said Mr. Johnson said we must take the man to the hospital. He had taken his false teeth out and dropped them in the water glass. We took him in Gene's car. I paid for a room and made the arrangements for him to be taken care of at the hospital."

The testimony of the defendant is substantially the same as that of Mrs. Johnson with reference to what occurred at the door of his home prior to the time he left to mail the letter.

He further testified:

"I went through the front door. I knew my wife was nervous, and I could not see any further questioning was necessary. I had told him we were not going to do anything. As I started out, I told him to go on about his business and let us alone. I told my wife to go back and lie down. I said, 'Don't bother with him any more.'

When I returned, she was out on the porch and this man was between her and the door. He had a paper in his hand and a pencil, insisting that my wife take the paper and sign it. I said, 'You don't have to sign anything.' I picked up some papers he had left on the stub porch column, handed them to him, and took hold of him, turned him around, and started him down the porch steps, and told him to go on about his business. I followed along behind him a step or two. All of a sudden he took off his glasses, turned around facing me, threw back his left hand as if to strike, and said, 'You are not a man enough to put me off.' I struck him in the mouth with my fist, and he staggered backwards, stumbled, and fell near the sidewalk. At my wife's suggestion I went in the house and tried to call Dr. Roberts, our family physician, both at his office and his home, but was unable to locate him. When the Hilburn boy came in, I told him to tell Mrs. Johnson to take the man to the hospital. I had no enmity towards the deceased and never intended to do him any serious injury. I didn't attempt to do him any injury until he turned on me, and then I struck him in self-defense and for the purpose of evicting him from my premises and home, I had directed and ordered him to leave several times previous, which he had refused to do."

The defendant called a number of witnesses to show his general reputation as a peaceable, law-abiding citizen was good, and the testimony of these witnesses covered a period of from ten to fifteen years while a resident of the city of Tulsa. The state put in no evidence to rebut that of the defendant as to previous good character.

The transcript of the testimony covers over 400 pages, but the foregoing is in substance the material testimony in the case.

A careful examination of the record and briefs convinces us that the trial court erred in refusing to give the following instructions:

"Defendant's Requested Instruction No. 1.

"Homicide is not without authority of law but is justifiable under the law of self defense when committed by any person when resisting an attempt to commit an assault upon him and there is reasonable ground on the part of the person doing the killing to apprehend a design or purpose of the person killed to assault him and do him some personal injury and it appears to the person doing the killing that there is imminent danger of bodily injury being done him by the person killed and you are instructed in this connection that any person who is unlawfully assaulted by another is justified in using all reasonable force necessary to repel such assault or attack as the same reasonably appears to him at the time and that if the person so assaulted uses no greater force than reasonably appears to him necessary at the time to repel such attack or assault, such person would be justifiable under the law of self defense provided the killing was not done in a cruel and unusual manner or by means of a dangerous weapon.

"Rejected. ·

"Exception allowed to Defendant.

"Harry L. S. Halley, Judge.

"Defendant's Requested Instruction No. 2.

"You are instructed that if you believe or have a reasonable doubt thereof that at the time of the alleged difficulty the deceased, without any act upon the part of the defendant, showing a purpose to do bodily harm to the deceased, did then and there by some act upon the part of the deceased then done, make it reasonably to appear to the defendant, viewed from his standpoint, that it was then and there the purpose of the deceased to assault him or to do him some personal injury, then the defendant had the right to defend himself against such an assault, if it was then and there necessary or apparently so, and if he did so strike the deceased under these circumstances, then you should find the defendant not

guilty; and unless you find beyond a reasonable doubt that the defendant unlawfully assaulted the deceased, under these instructions, you must return a verdict of not guilty.

"Rejected.

"Exception allowed to Defendant.

"Harry L. S. Halley, Judge.

"Defendant's Requested Instruction No. 3.

"You are further instructed that homicide is excusable in the following cases: When committed by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, or upon any sudden combat, provided that no dangerous weapon is used and the killing is not done in a cruel and unusual manner; and in this connection you are instructed that, if the homicide was committed by the defendant by accident and misfortune in the heat of passion, upon any sudden or sufficient provocation, or upon a sudden combat, and that the killing was not done in a cruel and unusual manner and not with a dangerous weapon, the homicide would be excusable, and you should find the defendant not guilty.

"Rejected.

"Exception allowed to Defendant.

"Harry L. S. Halley, Judge.

"Defendants Requested Instruction No. 4.

"You are instructed in this case that the deceased had a right to go and be upon the premises of the defendant for a lawful and legitimate purpose, and had a right to remain there for any reasonable length of time as long as he did so for such lawful and legitimate purpose and conducted himself in a lawful and legitimate manner. However, in this connection, you are instructed that if a dispute or difficulty arose while the deceased was upon the premises of the defendant for such lawful and legitimate purpose and the defendant ordered or directed the deceased to leave his premises and the deceased

refused or failed to do so immediately thereafter, then, in that event, the deceased became and was a trespasser upon defendant's premises immediately upon his failure or refusal to leave same after being ordered or directed so to do and you are further instructed in this connection that if you find from the evidence in this case or have a reasonable doubt thereof, that the defendant ordered or directed the deceased to leave his premises and that the deceased failed or refused to do so, then the defendant had a right to use such force as to him seemed reasonable and necessary to evict the deceased from his premises so long as he did not purposely and in a cruel and unusual manner take human life, and if you find and believe under the evidence in this case or have a reasonable doubt thereof that the deceased became and was a trespasser on the premises of the defendant, as above defined to you, and that the defendant, in attempting to evict the deceased from his premises, used no more force than seemed to him reasonable and necessary to evict the deceased from his premises or have a reasonable doubt thereof, you should find the defendant not guilty.

"Given in part."

This prosecution is based on sections 2223 and 2228, Penal Code (St. 1931), which read as follows:

"2223. Homicide is manslaughter in the first degree in the following cases:

"First. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"Third. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

"2228. Every killing of one human being by the act, procurement or culpable negligence of another, which under the provisions of this chapter, is not murder nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

Another provision of the Penal Code, § 2235 (St. 1931), reads:

"Homicide is excusable in the following cases:

"First. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

"Second. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

Section 1867 provides:

"To use or to attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases. First. * * *. Second. * * *. Third. When committed either by the party about to be injured or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense."

We do not deem it necessary to consider in detail the exceptions taken to certain instructions in No. 30 given by the court.

The rules of law applicable to a case of this character are plain and simple, and the instructions should not

extend beyond a plain statement of the law applicable to the case.

The instructions as to excusable homicide by reason of accident and misfortune fail to present affirmatively the issue of accidental homicide.

The word "misfortune" as used in section 2235, defining excusable homicide, is analogous to the word "misadventure," which, when applied to homicide, means the act of a man who is doing any lawful act and without any unlawful intent unfortunately kills another person. Gaunce v. State, 22 Okla. Cr. 361, 211 Pac. 517.

In instructions Nos. 15, 17, 18, 20, and 21, the court limited the right of self-defense to reasonable apprehension of a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished. In other words, the instructions given by the court denied to the defendant the right accorded him by the statute to defend himself against any assault about to be committed upon or against him.

In this character of case, such is not the law; that every man has the right to defend himself against any assault is elementary. No man is bound to measure the extent of the injury about to be done before he would be justified in defending himself.

The testimony on the part of the state is insufficient to show that the offense charged, manslaughter in the first degree, was committed, and that issue should not have been submitted to the jury.

The lawfulness of the act resulting in the death of Mr. Thomason was the defense. Accidental death to be wholly excusable must have resulted from the doing of some lawful act.

Ruling Case Law, vol. 13, p. 863, § 166, reads in part as follows:

"When the death of a human being is the result of accident or misadventure, in the true meaning of the term, no criminal responsibility attaches to the act of the slayer. When it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while he was engaged in a lawful enterprise, and that it was not the result of negligence—the homicide will be excused on the score of accident. * * * Whether in any particular case the homicidal act was the result of accident must be gathered from all the facts and circumstances surrounding the transaction, and it is peculiarly within the province of the jury to determine this, according to the well settled rules of law."

It is undisputed that the defendant was on his own premises where he had the right to be, and he had the right to use necessary and sufficient force to defend his habitation from unlawful entrance, or to prevent a trespass on the premises, also to prevent an offense against his person, "provided no undue advantage is taken nor any dangerous weapon used."

It follows that the court, in refusing to give the requested instructions, denied to the defendant the right to have the jury properly instructed as to the law of the case and to say by their verdict whether he went farther than the law justified in preventing a trespass upon his premises and in defense of his person from threatened assault. Dickinson v. State, 3 Okla. Cr. 151, 104 Pac. 923; Thomason v. State, 17 Okla. Cr. 666, 191 Pac. 1096; Buchanan v. State, 25 Okla. Cr. 198, 219 Pac. 420.

It is next urged that the judgment should be reversed because of remarks made by the assistant county attorney in his closing argument to the jury.

Suffice it to say that counsel seems to have undertaken to supply the want of evidence to the jury by reference to facts not in evidence. The defendant promptly objected to his remarks as being prejudicial and unfair. The court sustained the objections, and admonished the jury to disregard and not consider the same.

The prosecuting officer represents the public interest; his object, like that of the court and jury, should be simply justice. However, upon the record before us, we cannot say that it was such a flagrant case of improper remarks as to call for a reversal.

Upon the whole case we are without doubt as to the propriety and necessity of reversing the judgment.

For the reasons stated, the judgment of conviction is reversed, and the cause remanded to the district court of Tulsa county for further proceedings not inconsistent with the views herein expressed.

EDWARDS, P. J., and DAVENPORT, J., concur.