Bennie Westley McGREW, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12247.

Criminal Court of Appeals of Oklahoma.

Jan. 18, 1956.

382

Homer Thompson, Public Defender, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, Presiding Judge.

The defendant, Bennie Westley McGrew, a 17 year old youth, was jointly charged with a foster brother, Kenneth James Brewer, age 16, with the crime of murder. A severance was granted, McGrew was tried, convicted of manslaughter in the first degree and pursuant to the verdict of the jury sentenced to serve a term of 20 years imprisonment in the penitentiary.

The alleged murder involved the death of Thomas Harris, an 18 month old infant. The parents of the Harris infant worked in Oklahoma City and for about two and one-half months prior to the death of their infant son, Mrs. Lucy Lee Roberts, mother of the defendant McGrew, had been employed to take care of the Harris children including Thomas Harris during the day while the parents were at work. Just a few days prior to the alleged murder Mrs. Roberts, mother of defendant, secured employment which required her to go to work at noon each day. By an agreement worked out with the Harris parents, Mrs. Roberts continued to look after the children until time for her to leave for work after which time the children would be supervised by defendant McGrew and his foster brother, Kenneth Brewer.

Mrs. Roberts testified that on the date of the alleged homicide she left her residence at noon, leaving the Harris children in the care of defendant and his foster brother; that the infant, Thomas Harris, appeared to be in good physical condition except for a slight cold and a dark blue place which extended from the corner of his eye down to his check resulting from a fall from a bed a day or so before that time and that he also had a small bruised spot on his hip which had been caused from a fall from a bed on a previous date.

W. O. Daniels testified that he was a neighbor of Mrs. Roberts, mother of defendant; that on September 24, 1954, the date of the alleged crime, defendant came to his place and asked him to come look at the child as something was wrong with it; that when he saw the child he thought it was near death so he took it to the hospital. That defendant Bennie McGrew went with him to the hospital and held the child in his arms all the way there and remained at the hospital.

Dr. H. E. Groves testified that he was called about 3:30 p.m. to go to the Capitol Hill General Hospital. That he arrived there about five minutes later and examined the Harris infant and found it was dead. That there were bruises on the body of the infant so Groves called the police department and reported the death. That he asked defendant the cause of the bruises and defendant told him the bruise on the left brow had been caused by a fall from a bed and he did not know what caused the other bruises.

Dr. Howard Hopps, a pathologist, testified that he performed an autopsy upon the body of Thomas Harris about 9:00 p.m. the date of his death. That he found several areas of the body which were a deep reddish purple which represented trauma. They were particularly marked over the buttocks. The most serious wound and the one causing the death in the opinion of the pathologist was a hemorrhaging under the covering of the brain. The hemorrhaging had increased to such an extent that it pressed vital portions of the brain against bony ridges in the skull causing death.

The injuries found by the pathologist were caused by an application of force.

Marjorie Harris, mother of the deceased, testified that on September 24, 1954, she left all five of her children with Mrs. Roberts as usual; that Thomas Harris was lying in bed laughing when she left; that he appeared to be all right when she left except that he had one bruise on the left side of his face caused when he fell out of his bed on Sunday night. That defendant Bennie McGrew called her about 3:15 p.m. and told her the baby had fallen out of bed and for her to come home at once. That she took a taxi immediately and rushed home and when she arrived there she learned that her neighbor had taken her baby to the hospital so she went on to the hospital. That she talked to defendant who told her the baby had fallen out of bed and had gone into convulsions.

Jack Jordan, a policeman, testified that on the morning of September 25, 1954, he went to the residence of defendant and talked to defendant and Kenneth James Brewer in the presence of McGrew's mother in the living room of their home. That he told McGrew and Brewer that the baby appeared to have been beaten to death and asked them how it happened. That they each said the baby had been bruised when it fell out of bed a few days before that time. That he then asked them where the other bruises came from and they said the only thing they could think of was that while the baby was holding the mirror and trying to hold it up in front of himself so that he could see, that he would fall. Jordan then related that he took the two boys out to the police car and separated them. That he directed defendant McGrew to sit on the curb while he talked to Brewer in the police car. Over the objection of counsel for the defendant Jordan was permitted to relate a conversation had with Kenneth Brewer in the police car relative to the bruises on the body of the infant. As a predicate to the admission of this testimony Jordan testified that defendant was sitting on the curb about five feet from the automobile and in hearing distance of the conversation had with Brewer. Over repeated objections Jordan

testified that Brewer stated that he and McGrew had made up the first story about how the baby got the bruises on the body and that the truth was that during the day they tried to make the baby walk. That they had placed it up in front of a mirror to try to make it walk and that its legs would give out from under it and that the baby would fall and strike its head so they decided to not do that. They then took the baby into the living room and sat on a divan. That Brewer attempted to get the baby to stand up and the baby would not stand so Brewer struck the baby with his open hand several times on the buttocks. That during this time Bennie McGrew struck the baby with his open hand across the face knocking it down. That Bennie McGrew struck the baby somewhere about the head region or shoulder and knocked it to the floor. That Brewer tried to stand the baby up again but the baby didn't mind so Brewer struck it with his open hand and knocked it to the floor again. That Brewer picked the baby back up and tried to get it to walk but at this time it would not put its feet on the floor but it would draw its feet up under him so Brewer put the baby between his legs and tried to squeeze the baby in such a manner as to try to push the baby's feet to the floor. That McGrew got hold of the baby's knees and pulled them together to try to make the baby put its feet on the floor so as to try to teach it to walk. That when Brewer released the baby the baby fell on the floor so at this time Brewer took his belt from his pants and struck the baby several times with the belt. That defendant slapped the baby again. That Brewer spanked the baby again on the buttocks and later the baby became nauseated so Bennie McGrew suggested they take the baby over to the Harris home and put him in his bed. That Bennie carried the baby over and put it in its bed but the baby vomited on the way over to the Harris home. That Bennie put the baby in its bed and attempted to give it a bottle but the baby would not attempt to take the nipple and his left leg and hand appeared to be rigid. That Bennie became alarmed and ran to a neighbor's house for help. Jordan further testified that after

this conversation with Brewer he talked to McGrew and McGrew admitted striking the baby twice with his open hand. That he then took the boys and Mrs. Roberts to the police station. That he called in a stenographer and in the presence of the mother and the stenographer he asked Bennie McGrew to repeat what he had said to him in the automobile concerning the death of the infant. This statement was admitted in evidence without objection and reads as follows:

"Q. Benny, state your full name? A. Benjamin West McGrew.

"Q. Can you read and write? A. Yes, sir.

"Q. You understand Benny that we are taking this statement which will be typed on typewriter paper and that after it is just exactly as you have given, will you sign it? A. Yes, sir.

"Q. We have not made you any promise or threatened you in any way to obtain this statement, is that right? A. Yes, sir.

"Q. What you say in this story can be used in the event of prosecution either for or against you? A. Yes, sir.

"Q. Benny on the day of the 24th at approximately noon you and your brother Kenny stayed with the five Harris childen for that day, is that correct? A. Yes, sir.

"Q. Tell in your own words exactly what happened from the time that you started baby sitting and until the death of the baby? A. Well, as soon as my mother and I finished washing, she had to go to work and we brought the children over to the house to feed them and as soon as we finished feeding them, we took them over to put them to bed. We tried to make Thomas walk and Kenny wrapped his legs around and started squeezing. He slapped him on the back of the head and he fell over. Before that we were in the bedroom and he was trying to stand him on the dresser in front of the mirror. He stood for a while and fell down. Kenny tried to stand him up again and Kenny said the baby was not breathing right and he grabbed the pitcher and started to wash his face and Kenny took him outside and I told Kenny to go ahead and put him to bed.

"Q. Did you see Kenny slap little Thomas? A. Yes, sir.

"Q. Describe to us if you will? A. Well Thomas was sitting there and he picked him up and when he fell down, he slapped him on the back of the head.

"Q. What part of the head? A. Forehead.

"Q. Did it raise a knot or make a blue spot on the forehead? A. A blue spot and raised a knot.

"Q. Did you observe Kenny spank the baby with a belt? A. Yes.

"Q. What part of the body and how? A. The baby was on the floor and he was hitting where the belt fell, just anywhere the belt would land.

"Q. Did he have his belt on or off? A. He was using * * *

"Q. That is his belt lying there? A. That is not the belt he was using.

"Q. What was he using? A. He was using a belt that was at the house that mother used to use.

"Q. It is about that wide? A. Yes, sir.

"Q. He would strike him anywhere the belt landed? A. Yes, sir.

"Q. The baby was lying on the floor when he struck him? A. Yes.

"Q. This baby could not walk, is that right? A. Yes, sir.

"Q. He could push along to an object and pull up but could not walk? A. Yes, sir.

"Q. How many times Benny do you recall seeing Kenny strike Thomas about his head? A. Three or four.

"Q. At the time he struck him and knocked Thomas down and Thomas struck his head on the floor, did Thomas lay there? A. Yes, for a few minutes, Kenneth picked him up and I told Kenneth he had better let him go to sleep.

"Q. Did you and Kenneth discuss this incident and say that you would make up stories so that you would know what to tell in the event you were questioned by officers? A. Yes, sir.

"Q. You can start in now and tell about the baby acting peculiar and not breathing and when you took it outside. A. Yes.

"Q. Did you take him outside? A. Kenny took him and I was with him.

"Q. You said that the baby fell and struck his head on the floor apparently and that it appeared that it might have been paralyzed on one side. A. Yes, sir.

"Q. You took the baby outside and washed his face and it vomited and you brought it back? A. No, we took it outside and washed its face and we took it over and put it in its own bed.

"Q. Tell in your own words exactly what took place after the baby began acting peculiar and you went to phone. A. I was scared and I went over and asked Mr. Daniels if I could use the phone to call the mother and I called Marge Harris and told her and she said that she would be home as soon as she could. I went back to the house and after a while Mr. Daniels came and he said that the baby was almost dead and we put it in the car and he took it to the hospital.

"Benjamin West McGrew"

(It is significant that nowhere in this statement does McGrew state that he struck the infant although the police officer stated that he asked McGrew to repeat exactly what McGrew had stated to the policeman about the death of the child. Nowhere in the statement was there any question by the officer which would indicate that McGrew had previously admitted striking the infant with his open hand on two occasions the afternoon of the death of the infant.)

At the close of the evidence by the State counsel for the accused interposed a demurrer to the evidence and when that was overruled defendant rested his case without offering any evidence.

Several assignments of error have been presented. We shall confine our discussion to three of them which appear to have substantial merit and which are necessary for a proper disposition of the appeal: 1. The court erred in permitting the State to introduce in evidence statements made by a codefendant to a police officer out of the presence of accused. 2. The court erred in refusing to give defendant's requested instruction number one. 3. The verdict is not sustained by sufficient evidence.

As to the first assignment of error, both the State and the defendant based their argument on the question as to whether the alleged statement given by Kenneth Brewer was made in the presence of the defendant. As hereinabove pointed out the police officer testified that McGrew was sitting on the curb about five feet from the automobile and in the opinion of the police officer could have heard the conversation between Jordan and Brewer. The trial court acting on the theory that as the statement by Brewer was made in the presence of McGrew that it would not constitute hearsay and was admissible, permitted Jordan to relate the conversation had with Brewer. Counsel for the accused insists that the conversation was not in the presence of McGrew and refers to the testimony given by the officer at the preliminary examination where he testified that he separated the boys so that he could question them out of the presence of each other and try to find out the truth.

As we view the matter the question as to whether the statement of Brewer was given in the presence of McGrew is entirely immaterial. Even though McGrew had been sitting on the same seat in the automobile with Brewer at the time Brewer related his version of the death to the officer and McGrew had remained silent, the statement of Brewer would not have been admissible against McGrew. In the early case of Vaughan v. State, 7 Okl.Cr. 685, 127 P. 264, 42 L.R.A.,N.S., 889, this court gave an extended discussion of the admissibility of this character of testimony. The law of that case is stated in the syllabus as follows:

"It is error in the trial of a criminal case for the court to admit testimony as to declarations between an officer who had accused under arrest and the state's witnesses, or other persons, in the presence of the accused, tending to connect him with the offense charged, and that the accused remained silent as to such conversation; and, when a conviction results with such testimony before the jury, a new trial should be granted."

This court has consistently adhered to that decision in many other cases. Ellis v. State, 8 Okl.Cr. 522, 128 P. 1095, 43 L.R.A., N.S., 811; Towery v. State, 13 Okl.Cr. 216, 163 P. 331, L.R.A.1917D, 491; Ellington v. State, 24 Okl.Cr. 67, 215 P. 964; Patton v. State, 29 Okl.Cr. 66, 232 P. 454; Roy v. State, 77 Okl.Cr. 405, 142 P.2d 139; Walker v. State, 80 Okl.Cr. 21, 156 P.2d 143; Crabb v. State, 86 Okl.Cr. 323, 192 P.2d 1018. In Patton v. State, supra, it was held:

"Declarations of a defendant, made after the offense was committed, in the presence of a codefendant, are admissible against himself, but inadmissible against the other defendant.

"A defendant in custody is not called upon to contradict statements prejudicial to him, made in his presence, and, though they are not contradicted, they are not admissible in evidence."

In the recent case of Crabb v. State, supra [86 Okl.Cr. 323, 192 P.2d 1019], it was held:

"The declarations of a conspirator or accomplice are receivable against his fellow conspirators when they accompany and explain acts done in pursuance of a concerted criminal purpose, if made during the pendency of the common criminal enterprise; if made at a subsequent period and merely narrative of past occurrences, they must be rejected as hearsay.

"Where a party charged with the commission of a crime is under arrest; and a third party in his presence makes a statement to the officers which tends to connect the accused with the commission of the crime, and the accused remains silent, such statement, and the fact that the accused remained silent, is not admissible in evidence against him, for the Constitution clothes the accused with the right of silence, and it would be absurd to say in one breath he has the right of silence, and in the next to hold that he could be forced to testify against himself by the very act of exercising his right."

■ The trial court was acting under an erroneous impression as to the law and the objection to the testimony of policeman Jordan relating the statement given to him by the codefendant Brewer should have been sustained.

■ Defendant's requested instruction was as follows:

"You are instructed that in this case, an inference of intent to kill is not warranted from striking of a person on the head with fists, notwithstanding death results."

Counsel for the accused cites the case of Johnson v. State, 59 Okl.Cr. 283, 58 P.2d 156, as supporting the giving of the instruction sought by the defendant. The first syllabus of that case is in the identical language of the requested instruction. In that case the deceased was an adult who had an altercation with the defendant and was struck a blow in the mouth by defendant's fist. The rule of law and requested instruction as applied to that case were applicable. However, the same rule might not necessarily apply to the striking of an infant on the head with an open hand or with a fist. Instructions must be governed by the facts in each particular case with due regard for the theory of both the State and the defendant. In the instant case the jury did not find that the accused struck the infant with intent to kill which would have constituted murder. Instead the jury found defendant guilty of manslaughter in the first degree. From statements made by the jury in open court it is evident they found that the death of the infant was effected by the defendant without a design to effect death, but while engaged in the commission of a misdemeanor, to wit: by taking hold

of the infant and attempting to force him to walk. After the jury had retired to deliberate on its verdict, it came to the courtroom again for additional instruction on what constituted a felony and a misdemeanor and the court at that time gave additional oral instructions by agreement of counsel and it is evident from the statements of the foreman of the jury at that time that the jury had eliminated from their consideration any intent to effect the death of the infant but were discussing whether the acts of the accused and his codefendant constituted engaging in the commission of a misdemeanor or a felony. If such acts constituted engaging in the commission of a felony, it would constitute murder and if such acts would constitute engaging in the commission of a misdemeanor, then the death of the infant would constitute manslaughter in the first degree. The additional oral instruction by the court clarified in the jury's mind that the commission of a simple assault was a misdemeanor.

■ We think the requested instruction would have been proper if the county attorney was insisting on a conviction for murder, but in view of the fact that the jury did not find the accused guilty of murder, the refusal to give such requested instruction did not constitute reversible error. However, if this case is retried, the requested instruction should be given unless the issue of murder is taken out of the case by the trial judge in his instructions to the jury. This really is not a murder case so far as Bennie McGrew is concerned. The only issue is whether he is guilty of manslaughter in the first degree or manslaughter in the second degree or whether he is not guilty of either.

■ A close question is presented in connection with the consideration of the contention of the accused that the evidence was insufficient to support the verdict. By statute it is provided:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." 21 O.S.1951 § 172.

It is not contended by the State that defendant McGrew was the principal offender. It is conceded that Brewer alone struck the deceased with the belt which had a heavy buckle on it and that Brewer squeezed the infant between his legs and struck him many times on the buttocks and a few times on the face. However, it is contended that McGrew was a year older and that he was present and actively encouraged the commission of the crime. We think that although the evidence incriminating McGrew is not strong, there is some evidence that McGrew was present and participated to some extent in the beating which took the life of the infant. At least the evidence of the State was sufficient to justify the trial court in submitting the issue to the jury as to whether defendant participated in the commission of the alleged crime.

Reversed and remanded for new trial.

BRETT and POWELL, JJ., concur.